2023 IL App (1st) 220510-U

SECOND DIVISION
December 29, 2023

No. 1-22-0510

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF: | ) | |
| | ) | Appeal from the |
| AMANDA PLANCON, | ) | Circuit Court of |
| | ) | Cook County |
| Petitioner-Appellant, | ) | |
| | ) | 17 D 1289 |
| and | ) | |
| | ) | Honorable |
| MICHAEL PLANCON, | ) | Rosa M. Silva, |
| | ) | Judge Presiding |
| Respondent-Appellee. | ) | |

_____

JUSTICE ELLIS delivered the judgment of the court.
Justices McBride and Cobbs concurred in the judgment.

**ORDER**

¶ 1   *Held*: Reversed. Respondent did not carry burden of establishing that value of retirement benefits awarded to petitioner ex-spouse was newly discovered evidence warranting relief under section 2-1401.

¶ 2   Amanda and Michael Plancon settled their divorce and, in doing so, agreed that Amanda would receive 100% of Michael's employee retirement fund, operated by Fidelity, the present value of which they estimated at roughly $300,000. They entered into a qualified domestic relations order (QDRO) to reflect that transfer. Once that occurred, Amanda attempted to "cash out" those retirement benefits, opting for a lump-sum payment rather than a retirement annuity;

she decided that her need for immediate cash was more important to her than a pension upon retirement. The cash-out value under this benefit plan, Fidelity told her, was closer to $440,000.

¶ 3    When he learned of this cash-out value, Michael sought a reformation of the marital settlement agreement under section 2-1401 of the Code of Civil Procedure. See 735 ILCS 5/2-1401 (West 2020). Michael argued mutual mistake—that he did not realize that the retirement benefits that he had held for 15 years were worth $440,000 upon immediate cash-out. The circuit court agreed that a mutual mistake of fact occurred, opining that the parties initially believed that Amanda was receiving about $300,000, but that "[l]ater on, it came out that it was $440,000 in the span of *** five or six months, and that would be a windfall for [Amanda]."

¶ 4    We reverse the court's judgment. Michael did not demonstrate that any newly discovered evidence occurred here to justify his collateral attack on the marital settlement agreement. The record shows that Michael was aware, before even the initiation of the divorce, that his retirement benefit could be monetized in any number of ways, including retaining it as a retirement pension or withdrawing the proceeds as a lump-sum cash-out in lieu of a retirement pension. And if that fact had escaped him by the time the divorce was settled, as he claims, it remains that he should have known. The fact that Amanda, once in possession of that asset, opted to receive a lump-sum cash-out in lieu of a future pension was her choice to make, and Michael did not demonstrate that he was unaware that she had that option; to the contrary, the evidence showed that he knew or, at a bare minimum, should have known.

¶ 5                                    BACKGROUND

¶ 6    After a 17-year marriage, Amanda filed for divorce in 2017. In June 2019, the parties entered into a marital settlement agreement (MSA). The MSA concerned many provisions,

including many regarding the care, custody, and support of their three minor children (one of whom later became emancipated). But relevant here, the MSA divided up marital assets.

¶ 7        Amanda was given the residential home, where she would remain living with their three children. Amanda would be responsible for the mortgage payments as well as the home-equity line of credit (HELOC) payments and both parties' attorney fees. The MSA contemplated a possible sale of the residential home and included several provisions regarding that sale.

¶ 8        Paragraph 8.7(a) of the MSA provided that "[t]he parties shall divide their retirement accounts so that Michael receives $330,000 of retirement funds and Amanda receives the remaining amount." The parties thus divided up the retirement accounts as described below.

¶ 9        Michael, who was gainfully employed and had previously worked for 15 years for BP Amoco (BP), was allocated (1) all of his "NYL/Mainstay" IRA, valued at roughly $95,000; (2) all of his "ADP/Coats" 401K ($8,000); (3) all of his Roth IRA ($600); and (4) the sum of $226,115 from his "Fidelity BP 401K" that was valued at about $292,000, with the remainder going to Amanda. Those amounts added up to the $330,000 of retirement funds promised in paragraph 8.7(a).

¶ 10       In addition to receiving the remainder of Michael's BP 401(k) as described immediately above, Amanda received "100% of Michael's BP Retirement Accumulation Plan." This BP Retirement Accumulation Plan, or "BP RAP," is the subject of this litigation and bears extended discussion.

¶ 11       The MSA stated that the BP RAP had "a balance of $301,082 as of June 19, 2019." That number was taken from the most recent monthly statement sent to Michael, as the sole participant of the BP RAP. Like the BP 401(k), the BP RAP was to be transferred by a qualified domestic relations order (QDRO). From the proceeds, Amanda was required to pay $85,000 in

attorney fees to Michael's lawyers and $50,000 to Amanda's. The remainder of the fund went to Amanda. She could liquidate the account or she could roll the money over into another tax-deferred retirement plan like an IRA. If she chose to liquidate the account—that is, take the money immediately—Amanda would be solely responsible for the income-tax implications of doing so: "Amanda shall be solely responsible for any taxes or penalties incurred resulting from the early liquidation of retirement funds from this account."

¶ 12    In August 2019, the court entered the QDRO to effectuate the transfer of Michael's Fidelity BP RAP to Amanda. The QDRO correctly identified Michael as the original plan "participant" and Amanda as the "alternate payee." The QDRO noted, as well, that Amanda might withdraw the money as an early-retirement subsidy, as opposed to rolling it over into another retirement vehicle: "[t]he Alternate Payee is awarded a proportionate share of the Participant's early retirement subsidy, if any, when the Participant commences receipt of the accrued vested benefit in the Plan. Such proportionate share shall be calculated in the same manner as the Alternate Payee's share of the Participant's accrued vested benefit is calculated pursuant to this Order."

¶ 13    In October 2019, Fidelity wrote Amanda a letter indicating that it approved the QDRO as "qualified" under ERISA and the IRS Code as appropriate. The Plan also informed Amanda, the "Alternate Payee," that,

> "As of 12/1/2019, *the total estimated value of the benefit you are eligible to receive as a one-time lump sum payment is $440,124.35*. If you choose not to take your benefit as a lump-sum payment, you may receive this estimated benefit amount as any one of the payment options listed below. Description of your payment options follow.
>
> | Payment Option | Amount |
> | --- | --- |
> | Partial Lump Sum | $220,062.18 |

| Single Life Annuity | $1,861.42 |
| Residual Annuity | $930.71." (Emphasis added.) |

¶ 14    The letter explained that a "partial lump sum" payment was a "partial value of the retirement benefit paid in one payment instead of monthly payments," along with a "residual annuity," which was "[a]n annuity paid in addition to a partial lump sum payment." A "single life annuity" was a "fixed monthly benefit for your lifetime *** with no additional benefits payable upon death."

¶ 15    When Michael became aware of this letter, which among other things gave her the option of an immediate cash-out in the amount of $440,000, he contacted Fidelity to no avail. He refused to give consent to Fidelity to permit the distribution to Amanda, which Fidelity required to effectuate the transfer of the retirement plan from Michael to Amanda. Amanda filed a petition for a rule to show cause why Michael should not be held in contempt; Michael cross-filed a section 2-1401 petition seeking to reform the MSA to reflect that the BP RAP was worth roughly $440,000, not $300,000, and to allocate him 45% of the amount over and above $300,000 to prevent a windfall to Amanda. His claim was that the mistaken valuation of the BP RAP was a mutual mistake of fact that justified reformation.

¶ 16    In October 2019, the court entered an order restraining Amanda from spending the cash-out proceeds from the BP RAP until further order of the court. Despite this order, Amanda spent some of that money (after 20% was withheld by Fidelity for taxes) to purchase a new home after selling the residential home.

¶ 17    In part due to the COVID pandemic and in part due to contentious fighting between the parties, the hearing on the section 2-1401 petition was not held until March 2022. At that hearing, Michael was represented by counsel and Amanda was self-represented. We can safely

say at the outset that the hearing was contentious, littered with objections by Michael's counsel, with admonishments of Amanda by the court, and with Amanda, appearing *pro se*, often intermingling argument with testimony.

¶ 18    For his case-in-chief, Michael, the movant, presented one and only one witness— Amanda. Counsel confirmed that Amanda had deposited the cash-out proceeds of the BP RAP into a separate Fidelity account; Amanda readily agreed, though she noted that she did not receive the entire $440,000, as Fidelity withheld 20% for taxes. Amanda also agreed that she had used some of the proceeds to buy her new home after selling the marital residence in 2020. She testified that with virtually no income, a good deal of debt incurred that (according to Amanda) Michael had stopped paying once the marriage broke down, a house she was unable to sell, and her inability to obtain a mortgage given the debt she was carrying, she felt compelled to use the cash to buy a new home for her and her children.

¶ 19    Counsel asked her if the MSA reflected, generally, a 55/45 split of the assets between Amanda and Michael, respectively. Amanda denied that assertion, noting that nothing in the MSA indicated as much and claiming that she felt the split was intended to be closer to 70/30 in her favor.

¶ 20    That was the entirety of the live testimony elicited by Michael. Counsel did not call Michael but chose to rest on Michael's affidavit attached to the section 2-1401 petition. In his affidavit, regarding his realization that the cash-out value of the BP RAP was about $440,000, Michael stated that "[n]either the [*sic*] myself, Amanda, nor our attorneys could have reasonably discovered this evidence at the time of entry of the Judgment. We exercised due diligence in ascertaining the true value of the account, and Fidelity has still not provided an explanation regarding the anomaly."

¶ 21    Amanda testified in her own case. She made several points. For one, she said that Michael had been the sole participant in the BP RAP for 15 years and knew or should have known of the possibility of a lump-sum, immediate cash-out option. She also argued that Michael, who had an MBA in finance, could surely appreciate the difference between the present value of a retirement plan—roughly $300,000—and the future value, which the lump-sum cash-out amount obviously included.

¶ 22    Amanda called Michael as a witness. Michael agreed that, under paragraph 8.7(a) of the MSA, the parties capped the allocation of Michael's retirement funds at $330,000 for Michael but provided that "Amanda receives the remaining amount"—meaning her amount had *no* cap.

¶ 23    Michael denied that he knew that the immediate lump-sum, cash-out was an option he could exercise at any time under the BP RAP. He agreed, however, that on January 13, 2016 (months before the marriage broke down), Michael and Amanda met with a Mary Heaton, a Fidelity vice president and "executive planning consultant." They met, in Michael's words, for "retirement planning."

¶ 24    At the hearing, Amanda presented Michael with a document that Ms. Heaton prepared for them regarding retirement planning options. Michael agreed that the document explained the options for the BP RAP. It provided the option of "single life annuity." It provided an option for a "50% joint and survivor annuity." It provided an option for "partial lump sum."

¶ 25    It also included an option for "lump sum." Michael agreed that the document advised him that, were he to exercise the option at age 45, the one-time, lump-sum cash-out would be $292,093.93. If he exercised the option to fully cash out at age 55, the lump-sum amount would jump up to $860,440.44. And if he were to fully cash out at age 60, he would receive a lump sum of $959,346.76.

¶ 26    Michael also admitted that BP gave him a benefits handbook, though he never read it.

¶ 27    Michael's counsel did not examine Michael and presented no further evidence.

¶ 28    In closing argument, Michael's counsel reiterated that the parties reasonably believed that the value of the BP RAP was about $300,000, not anywhere close to $440,000. Counsel acknowledged that the MSA never specifically set forth a 55/45 split in Amanda's favor but added that a provision in the MSA provided that, if any additional, previously undisclosed assets were discovered, they would be split 50/50—and Michael, here, was only asking for 45% of the amount over and above $300,000 from the BP RAP.

¶ 29    Amanda made several points in her closing argument. She reiterated that Michael was the sole plan participant on this BP RAP for 15 years and knew or should have known of its options. She reminded the court that Michael admitted under oath that he received a document fully explaining the lump-sum cash-out when he met with Mary Heaton in 2016. She again argued that someone with an MBA in finance should know the difference between the present value of a plan and its future value. She claimed that Michael was conveniently "feigning ignorance" now in an attempt to "double dip."

¶ 30    Amanda also argued that it was unfair to measure the overage as the difference between $300,000 and $440,000 for several reasons. One, Fidelity took 20% out in taxes because she withdrew it immediately as income, so she did not receive the full $440,000. She also noted that immediately cashing out the BP RAP came at a personal cost to her—she now had "zero pension." She told the court (as she had during her testimony) that she was compelled by dire economic circumstances to cash out the fund, that (1) Michael had been delinquent on child support and maintenance; (2) her credit rating was destroyed because of all the debt she was required to pay off as a condition of keeping the residential home, most of which she blamed on

Michael, which meant that she was unable to obtain a mortgage and thus needed cash to purchase a new home for her and the children.

¶ 31    At the close of the hearing, the court entered judgment in favor of Michael:

"I believe the parties both were in agreement that money that was going to be awarded to Ms. Amanda was in the amount of $301,082. Everyone signed the marital settlement agreement. It was initialized on every page and there was discussions amongst the parties. The parties did do due diligence. They got a report, and that's how they knew that amount that was going to be given to Ms. Amanda was $301,082. So they did do due diligence. Later on, it came out that it was $440,000 in the span of, I don't know, five or six months, and that would be a windfall for Ms. Amanda."

¶ 32    The court thus entered an order reforming the MSA and granting 45% of the difference between the approximately $300,000 and $440,000—specifically, $56,049.74.

¶ 33    This appeal followed.

¶ 34                                    ANALYSIS

¶ 35    We begin by addressing the quality of the briefs. Both sides have litigated this appeal without legal representation. Initially, Amanda's opening brief contained no citations to the record. After Michael's brief pointed this out, Amanda sought leave to file a corrected brief containing no additional argument or content but supplying record citations. We granted that motion. The corrected brief may not be a model of record citation, but we were able to locate the relevant information based on Amanda's citations.

¶ 36    Michael's brief, for its part, contains no substantive discussion. He only raises one of two points (or both) to each argument made by Amanda: that she did not raise the argument below, or that she failed to cite to the record and thus her brief should be disregarded.

¶ 37    True, many arguments Amanda raises on appeal were not raised below. It is likewise true that her citation to case law is sparse. And many of her arguments appear to border on frivolous.

¶ 38    Still, she does raise an argument that was not only raised at trial but was the centerpiece of her position below: "The trial court legally misapplied [section 2-1401] *** when ruling in Michael's favor because the court mischaracterized whether Michael could have known or not, and crucially prior to the MSA, that the sum Amanda would ultimately receive as her pension payout would not be the *** one point-in-time valuation stated in the MSA, but a higher figure reflecting the application of the actuarial calculation by the Plan Administrator to project, at whatever time Amanda elected to monetize her pension, that same pension to the value she would be entitled to receive if she had waited until age 65 to draw it down."

¶ 39    Amanda adds that "[t]here was multiple evidence [*sic*] *** at trial on March 14, 2020, that Michael did know, or should have known if he had minimum due diligence, prior to the execution of the MSA that Amanda would receive a higher sum of money, and ergo, there was no error in the MSA because he was acquainted all along with the terms of the BP RAP."

¶ 40    That argument is coherent and properly before us. It includes citations to the record and, while the argument is short on case law, this is a relatively fact-intensive question she raises.

¶ 41    Michael's response to this argument in the brief is this: He "again asks this Court to ignore Appellant's Argument Number 13 for the two reasons repeatedly stated above: 1) this argument was not made to the trial court, and 2) Appellant has not given Appellee or this Court the basis for her 'Facts' to support this argument."

¶ 42    This argument was clearly made below—it was essentially Amanda's entire argument— and we have no trouble discerning the relevant facts in this record. We move to our analysis.

¶ 43    Because the law favors finality of judgments, a litigant seeking to upset a final judgment more than 30 days after its entry must file a petition under section 2-1401 of the Code of Civil Procedure. See 735 ILCS 5/2-1401 (West 2020). The purpose of a section 2-1401 petition is to alert the circuit court to facts which, had they been known at the time, would have precluded entry of the judgment. *People v. Haynes,* 192 Ill. 2d 437, 461 (2000). " 'However, the proceeding is not intended to give the litigant a new opportunity to do that which should have been done in an earlier proceeding or to relieve the litigant of the consequences of her mistake or negligence.' " *In re Marriage of Goldsmith*, 2011 IL App (1st) 093448, ¶ 15 (quoting *In re Marriage of Himmel,* 285 Ill.App.3d 145, 148 (1996)).

¶ 44    We review the court's factual findings on a section 2-1401 petition, after an evidentiary hearing, under a manifest-weight-of-the-evidence standard. See *In re Marriage of Labuz,* 2016 IL App (3d) 140990, ¶ 36 n.3; *In re Marriage of Rocha,* 2015 IL App (3d) 140470, ¶ 34. But the ultimate decision the trial court makes includes not only findings of fact but the exercise of discretion; the petition "invokes the equitable powers of the circuit court to prevent enforcement" of a judgment when it would be "unfair, unjust, or unconscionable." *Warren County Soil and Water Conservation District v. Walters*, 2015 IL 117783, ¶ 50. Thus, we review the ultimate judgment for an abuse of discretion. *Id*. ¶ 51; *In re Marriage of Labuz*, 2016 IL App (3d) 140990, ¶ 36 n.3. An abuse of discretion occurs when no reasonable person would adopt the trial court's view. *In re Marriage of Labuz*, 2016 IL App (3d) 140990, ¶ 36.

¶ 45    To obtain relief under section 2-1401, the petitioner is required to affirmatively plead specific factual allegations supporting each of the following elements: (1) the existence of a meritorious claim; (2) due diligence in presenting that claim in the original action; and (3) due

diligence in seeking relief under section 2-1401. *In re Petition of the Village of Kildeer To Annex Certain Territory,* 124 Ill. 2d 533, 544 (1988).

¶ 46 When, as here, the movant seeks to set aside a judgment based on newly discovered evidence, the petitioner must show that "the new evidence was not known to her at the time of the proceeding and could not have been discovered by the petitioner with the exercise of reasonable diligence." *Goldsmith*, 2011 IL App (1st) 093448, ¶ 15; see *Cavitt v. Repel*, 2015 IL App (1st) 133382, ¶ 46 ("to set aside a judgment based on newly discovered evidence, the evidence must be such as could not reasonably have been discovered at the time of or prior to the entry of the judgment."); *In re Marriage of Buck*, 318 Ill. App. 3d 489, 493 (2000) ("the evidence must be such as could not reasonably have been discovered at the time of or prior to the entry of the judgment."). The burden lies with the petitioner—here, Michael. *Smith v. Airoom, Inc.*, 114 Ill. 2d 209, 221 (1986); *Cavitt*, 2015 IL App (1st) 133382, ¶ 45.

¶ 47 Michael claims that Amanda's ability to convert the BP RAP into a one-time, lump-sum cash-out of about $440,000 was evidence newly discovered to him in October 2019, some four months after the MSA was executed. We agree with Amanda that Michael did not carry his burden of proving that fact.

¶ 48 For one thing, it was Michael's burden of proof, as noted above, yet he put on no evidence to prove this fact. He did not call himself or anyone other than Amanda as a witness. His counsel chose to rely on Michael's affidavit. As noted earlier, on this topic, Michael simply stated in rather conclusory fashion that "[n]either the [*sic*] myself, Amanda, nor our attorneys could have reasonably discovered this evidence at the time of entry of the Judgment. We exercised due diligence in ascertaining the true value of the account \*\*\*." Michael and his lawyers seemed to regard this fact as self-evident.

¶ 49    But Amanda convincingly showed otherwise in her examination of Michael at trial. Michael conceded that, just months before the breakdown of their marriage, he was provided with a retirement plan that clearly indicated, among other options, that he could cash out his BP RAP in one lump sum, which was larger than the present value of the fund and obviously would be a larger number the later he waited before cashing out. He was shown projections for what this lump-sum payment would be if he were to cash out at different ages, including age 55 ($860,440.44) and age 60 ($959,346.76).

¶ 50    The various options available to the BP RAP participant—which was exclusively Michael for 15 years—was obviously not a secret and was certainly not information unavailable to him; quite to the contrary, on at least one occasion, he was specifically given the information by the Fidelity representative. And he admitted at trial that he had access to a benefits handbook and a Fidelity representative to provide him information at any time over the 15 years that he was a participant in the BP RAP before transferring it to Amanda.

¶ 51    We need not go as far as Amanda, who claimed that Michael knew full well of this lump-sum cash-out option and merely "feigned ignorance" to get some extra money from his ex-spouse. But on this record, Michael simply did not prove that this information was "newly discovered," that the information "could not reasonably have been discovered at the time of or prior to the entry of the judgment." *Cavitt*, 2015 IL App (1st) 133382, ¶ 46.

¶ 52    Allowing Michael to prevail here would be to give him "a new opportunity to do that which should have been done in an earlier proceeding" and "relieve [Michael] of the consequences of [his] mistake or negligence.' " *In re Marriage of Goldsmith*, 2011 IL App (1st) 093448, ¶ 15 (quoting *In re Marriage of Himmel,* 285 Ill. App. 3d at 148).

¶ 53    The trial court thought it self-evident that an unforeseeable mistake occurred here. The court's characterization of the issue, however, does not square with the evidence. The court noted that, while the parties had believed the BP RAP to be valued at roughly $300,000, "[l]ater on, it came out that it was $440,000 in the span of *** five or six months." The court was describing this financial asset as if it had suddenly ballooned in value almost overnight, like a house or some fixed asset that suddenly and unexpectedly doubles in value for some reason.

¶ 54    That was obviously not the case here. Nothing magically or unexpectedly happened. The option of the BP RAP that Amanda employed was always a feature of the plan. Amanda demonstrated the different ways that a BP RAP participant could monetize the BP RAP *at any time*, at any age, with pros and cons for each option. She chose to withdraw it all at once at a relatively young age, recognizing that she was giving up a pension or any other future annuity in the process (not to mention a far more generous accrual if she waited a little longer to cash out), because she needed the cash right now—she needed to buy a new house and was unable to get a mortgage, and she was drowning in debt with little income.

¶ 55    In any event, her reasons for taking the early cash-out are not relevant. There was no aspect of the BP RAP plan about which Michael, a 15-year participant in the plan, could not have known through the exercise of reasonable diligence. Though he denied at the hearing that he was aware of that cash-out feature, the record unequivocally shows that, even if he did not know, he reasonably should have known; he had all the relevant information and access to that information throughout the 15 years that he was a BP RAP participant.

¶ 56    If this were a situation where some aspect of an asset were hidden by one spouse from another, the outcome might well be different. See, *e.g.*, *In re Marriage of Buck*, 318 Ill. App. 3d at 497–98 (reversing dismissal of section 2-1401 petition; question of fact remained as to

whether ex-husband concealed fact that interest in company allocated to him in divorce contained rights to other valuable property, unbeknownst to ex-wife, rendering stake in that company far more valuable than ex-wife could have known when MSA was executed).

¶ 57    But there is no allegation that Amanda did anything to hide or conceal this information; as the evidence showed and as Amanda said repeatedly below, she could not possibly have done so. As the plan participant for 15 years, it was Michael and only Michael to whom the BP RAP information was routinely sent. And though Amanda herself was unaware of the specifics of these options under the BP RAP, she is not the one trying to reform the MSA after the fact. Michael is, and thus Michael bears the burden of proving, by a preponderance of the evidence, that this aspect of the BP RAP was unknown to him and could not have been reasonably discovered by him through the exercise of reasonable diligence. He did not carry that burden and, as discussed, really made no *attempt* to prove that fact.

¶ 58    The trial court never specifically found that Michael proved this fact, but the court's ruling in his favor implicitly did so. In any event, that finding is against the manifest weight of the evidence, as the opposite conclusion is clearly evident; Michael clearly should have known, if he did not actually know, of the various options contained in the BP RAP at the time the parties entered into the MSA. Because Michael could not establish the existence of newly discovered evidence justifying a postjudgment attack on the MSA, the court's ultimate judgment in favor of Michael was an abuse of discretion.

¶ 59                                    CONCLUSION

¶ 60    The judgment of the circuit court is reversed.

¶ 61    Reversed.