2024 IL App (1st) 230642-U

SIXTH DIVISION

November 8, 2024

No. 1-23-0642

**NOTICE**:  This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| KPLN HOLDINGS LLC-5236 KENMORE SERIES, | ) )  | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 19 L 10848 |
| JODIE EASON AND JORDAN MCCLURE, | ) ) | Honorable Daniel J. Kubasiak, |
| Defendants-Appellees. | ) | Judge, presiding. |

_____

JUSTICE C.A. WALKER delivered the judgment of the court.
Presiding Justice Tailor and Justice Hyman concurred in the judgment.

**ORDER**

¶ 1   *Held:*   We affirm the circuit court's denial of appellant's petition to vacate pursuant to section 2-1401 of the Illinois Code of Civil Procedure (Pub. Act 102-813, § 675 (eff. May 13, 2022) (amending 735 ILCS 5/2-1401)) because appellant's newly discovered evidence did not demonstrate that the appellees perjured themselves at an earlier trial.

¶ 2     This appeal arises from an initial action by appellant KPLN Holdings LLC-5236 Kenmore Series (KPLN) against the appellees Jodie Eason and Jordan McClure (collectively "initial buyers"), following which the circuit court entered an order awarding the initial buyers damages pursuant to a counterclaim regarding alleged defects in a condominium unit ("the Unit") they purchased from KPLN. The initial buyers then sold the Unit to the "subsequent buyers," and in doing so, provided a Disclosure form pursuant to the Residential Real Property Disclosure Act (765 ILCS 77/1 *et seq.* (West 2020)) on April 22, 2022. On October 14, 2022, KPLN filed a petition to vacate the court's order pursuant to section 2-1401 of the Illinois Code of Civil Procedure (Pub. Act 102-813, § 675 (eff. May 13, 2022) (amending 735 ILCS 5/2-1401)), alleging the Disclosure form revealed the initial buyers had perjured themselves at the underlying trial. The court denied the 2-1401 petition, and KPLN now appeals, arguing the denial was an abuse of discretion. We affirm.

¶ 3                                    BACKGROUND

¶ 4     KPLN filed the complaint in the underlying case against the initial buyers on October 2, 2019. Therein, KPLN alleged negligence, defamation, tortious interference with contract, and fraud. KPLN generally complained that the initial buyers damaged the Unit by refusing to reduce the humidity therein and published defamatory material about KPLN on a "fake website."

¶ 5     The initial buyers filed a counterclaim, alleging, in relevant part, breach of warranty regarding the Unit. The allegations included complaints of leaks with an upstairs door leading to the roof of the Unit, mold near the back door, issues with an outdoor structure the parties described as a "doghouse," leaks near the vanity, mirror, and cabinets in a bathroom, issues with the heating, ventilation, and air conditioning (HVAC) system, issues with tiles and sealant in the master bathroom and shower, damage near the windows and patio doors, and holes in the drywall.

¶ 6     Following a five-day bench trial in December 2021, the circuit court ruled in favor of the initial buyers and awarded them $120,437.40 in damages. KPLN appealed, but this court dismissed for lack of jurisdiction on March 16, 2023. See *KPLN Holdings, LLC v. Jodie Eason and Jordan McClure*, No. 1-22-0554 (March 16, 2023) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 7     On October 14, 2022, KPLN filed the present 2-1401 petition, alleging the order awarding the initial buyers damages following the underlying trial should be vacated because Eason and McClure perjured themselves at trial, as evidenced by the Disclosure form. Specifically, KPLN argued that, "There were 5 days of testimony and [the initial buyers] testified at length about the numerous problems of [the Unit] including significant damage from the flooding. However, just four months after their testimony and 2 months after this Court entered the judgment, [the initial buyers] executed on April 22, 2022 the statutorily mandated seller disclosure statement stating there was never any flooding and denied all the serious problems" testified to at the underlying trial. The petition identified certain passages of testimony it believed perjurious, including both McClure's and Eason's testimony "regarding serious flooding and other substantial defects in [the Unit]." KPLN also identified the following testimony as perjurious:

> "Jordan McClure testified on December 15 about the ceiling leaks; [Eason] testified about the patch in the flooring, the problems with the doghouse roof, the thin walls and the water pressure, the problems with the back door and that there were lots of water by the windows and casements, the related mold, the roof leak and mold around the roof [and the] the mold in the door frame, water in the master bathroom, the roof leaks again on and the mold on the doorframe, back door leak and also the water issue, water by the vanity and the ceiling

in the primary bathroom, the HVAC leaks, and there was significant damage in the guest bath."

KPLN concluded "it is unlikely that [the initial buyers] lied in their disclosure," and thus "their lies existed at the trial before this Honorable Court."

¶ 8    KPLN attached the affidavit of Alexy Kaplun, the president of the building's homeowner's association ("HOA") (who lived in another unit in the building) to the petition. In the affidavit, Kaplun averred he had "not received any request *** to initiate any construction on [the Unit]," he and his family had "not observed any workers or contractors doing any work" on the Unit from 2020 to the June 2022 resale, and there was "camera footage from April through the sale which shows no workers had performed the large number of works referenced in the testimony."

¶ 9    The Disclosure form, also attached to the petition, contained only one checked box identifying a material defect, specifically a box indicating the existence of "leaks or material defects in the roof, ceilings, or chimney." In an explanation section, the initial buyers wrote, "During routine A/C cleaning, the HVAC service tech reported the doghouse roof (common element) felt soft. No water intrusion has been discovered or observed."

¶ 10    The attached portions of the trial transcript included McClure's testimony that there was a "ceiling leak which came from the roof and then, of course, after the polar vortex we had the major issues, which was in the end of January 2019." The transcripts of Eason's testimony included her statements regarding a "patch" on the floor. Eason also testified regarding issues with the master bathroom vanity and mirror. After she and McClure moved in, mold "appeared" near the "transom," and after the polar vortex, "a lot of water [came] into our unit around our window casements." Additionally, the Unit had "a roof leak. There was a stand pipe on the doghouse roof that leaked into our unit." There were also persistent "moisture" issues in the Unit, which

dehumidifiers helped mitigate. Finally, she testified to "significant damage still around all of our windows" and the patio door.

¶ 11    The initial buyers responded to the 2-1401 petition, generally contending that they "disclosed the majority of the defects in the Disclosure Report to which [KPLN] is now arguing were not disclosed," and remediated other defects that they highlighted at trial. Specifically, they emphasized that (1) the Disclosure form mentioned roof defects; (2) other defects cited by KPLN in the 2-1401 petition were cosmetic, not material, including the floor patching and water pressure; (3) they paid Priority Energy to repair the HVAC issues that caused the humidity problems, and Kaplun's affidavit did not disprove that; (4) the mold and leaks around the doors and windows were not in the Disclosure form because they remediated these issues by hiring a painter; (5) they personally repaired the vanity, bathtub, and shower; and (6) they sold the Unit for "$50,000" less than the cost of comparable property because of the defects. They also emphasized the additional information they provided to the subsequent buyers in an email exchange between the parties' attorneys which discussed the litigation against KPLN. Regarding Kaplun, the initial buyers argued his affidavit was false and biased, in part because he was the "brother of the principal of the [KPLN]," and his averments regarding video evidence were impossible given how the building's cameras functioned.

¶ 12    Eason's affidavit, attached to the response, contained further detail regarding the alleged repairs. Therein, Eason averred that the initial buyers hired Priority to service the HVAC system and Bright Painting to do "plaster work around the windows and doors, remove mold and do painting work around the Unit," but she did not preserve invoices or receipts. She also stated, "It is my understanding of the security cameras at the Property, that they cannot save footage for the

period of time that Alexy Kaplun claimed he reviewed footage to see if we had repair contractors doing work at the Property."

¶ 13    The initial buyers also attached redacted checks from themselves to Priority and Bright, receipts for purchases of grout and other repair materials, and a letter from their attorney to counsel for the subsequent buyers which disclosed the underlying lawsuit. The letter stated,

"In September 2019, [KPLN] filed suit against the [the initial buyers] for damages (alleging negligence) stemming from the Polar Vortex on or about January/February 2019. *** The lawsuit concluded, with the [initial buyers] found/ruled not responsible for any Property damage or negligence.

Regarding the damages caused by the 2019 Polar Vortex, corrective action was taken to fix the issues, including:

(a)  Damages to drywall/windowsills from water seepage during the polar vortex were repaired.

(b) The walls/masonry were suspected of hiding additional moisture at the time of the polar vortex which froze over and caused the damage. To address this:

1.  The building/developer sealed the brick/masonry of the building (a normal process which had not yet been done since the building was new) at no additional cost to unit owners.

2.  Aeroseal duct sealing was performed on the HVAC system for [the Unit].

3.  An air intake pipe ruled unnecessary by engineering analysis (located in the utility room on the top floor/roof) was sealed."

¶ 14    The circuit court conducted an evidentiary hearing on the 2-1401 petition on March 27, 2023. At the hearing, KPLN called Kaplun, who testified that he lived in the same building as the

Unit and shared garbage facilities with the initial buyers. The building is equipped with cameras. Following the underlying trial, the initial buyers did not file any work requests, despite the HOA's requirement that tenants provide notice of any work in their units. He did not observe any indication of drywall or plaster work from the building's garbage facilities, and based on his knowledge of the building, Kaplun did not believe the Unit even contained plaster. Via camera, he did observe painters enter the Unit at some point. They entered with "some paint and materials," and exited with garbage bags. He believed the painters worked on the Unit on March 30, 2022, but the work "[c]ould" also have consisted of a "couple of people over a few-day period." The painters did not wear protective equipment related to mold remediation.

¶ 15  On cross-examination, Kaplun acknowledged that while his affidavit stated he and his family had not observed "any workers or contractors doing any work" on the Unit from 2020 to summer 2022, he had in fact witnessed painters there in March 2022.

¶ 16  KPLN called Eason to testify. She acknowledged that the letter from the initial buyers' attorney to the subsequent buyers' attorney did not relay the specifics of any work the initial buyers performed on the Unit. Priority's HVAC work occurred on March 23, 2022. She let the Priority workers into the Unit, but did not remain to supervise. Eason agreed that while she averred in her affidavit that Priority's work fixed the water pooling and condensation issues, she and McClure were not always present at the Unit following that work because they lived elsewhere at the time.

¶ 17  Regarding Bright's work, Eason testified they started on March 23, 2022, and returned the Unit's keys on April 16. The work included mold remediation on the exterior of the doghouse. She did not observe the work personally, and when she let the Bright workers into the Unit, they were not wearing masks. Before Bright's work, she did not hire anyone to do an air quality test, take a mold sample, or create a mold remediation plan. She responded to the question, "How do you

really know that they actually remediated the mold?" by stating, "I don't. I have to take their opinion that they did the work as they were paid." Eason did not mention mold remediation on the Disclosure form or in any other communication with the subsequent buyers because she "didn't think it was relevant." Eason acknowledged she did not provide notice to the HOA of any work on the Unit, and stated she believed she was not "required to by the bylaws." She agreed a condominium declaration document stated, "the unit owner shall notify the association of any improvements, additions, alterations in writing."

¶ 18    Regarding the water infiltration issues she referenced at the underlying trial, including from the ceiling, windows, doors, and vanity, Eason testified that the initial buyers had "repaired" these issues between the date of her trial testimony and the date they signed the Disclosure form. Though she and McClure performed substantial work on the Unit, she did not have any pictures or other documentation showing the work they performed, aside from the receipts from their purchase of materials. She agreed she did not pay Bright $100,000 for their work.

¶ 19    KPLN rested, and Eason testified in the initial buyers' case. She stated it was her understanding that unit owners only needed to inform the HOA of changes to a unit "if there's any impact on the ability for the board to get insurance." Accordingly, she did not believe notice was required for the repairs done to the Unit. Regarding the security cameras, Eason believed they were "live recording, and that every 24 hours, it overwrites," and thus the security camera footage could not be preserved as Kaplun claimed.

¶ 20    Regarding Priority, Eason testified that it was her understanding that Priority completed the HVAC repairs and fixed the issues testified to at the underlying trial, which she based on information Priority provided her. Eason confirmed Priority's representations were the basis for the initial buyers' decision to check the box for "no" regarding HVAC defects on the Disclosure

form. Regarding Bright, she testified that they remediated the mold on the doghouse door, patched the walls, "resealed and reseated the exterior doors," and applied spackling or plaster to all window frames. Eason explained that though she did not live in the Unit while the contractors worked on it, she visited over 10 times between March 24 and April 22, the date of the Disclosure. On cross-examination, Eason testified she performed the grouting work herself.

¶ 21 McClure testified that he wrote checks to Priority for the HVAC work and to Bright for "painting, drywall work, mold remediation, plaster around the windows, etc." Bright cashed the checks.

¶ 22 The initial buyers rested, and their attorney moved to admit the checks to Priority and Bright, which the circuit court permitted over KPLN's objection.

¶ 23 The exhibits from the evidentiary hearing are included in the record on appeal. KPLN's Exhibit 7, an email from the initial buyers' attorney to the subsequent buyers' attorney, contains the following exchange:

Subsequent Buyers Question: "I guess my biggest concern and question is for the issue & damages were repaired & corrected? If so, can they provide proof that the work was completed?"

Initial Buyers' Response: "Yes. These are the repairs that were already disclosed to the buyers during contract negotiations (the AeroSeal duct sealing by [the initial buyers], and the exterior brick sealing by the Developer/Association)."

\*\*\*

Question: "Just want to be sure that there are no issues with the unit and that the corrective work was completed and resolved the issue."

Response: "There are currently no issues with the unit that [the initial buyers] are aware of, aside from what was stated in their Disclosure ***. The [initial buyers] have done corrective work/repairs for the past issues, which have been laid out above."

¶ 24    Initial Buyers' Exhibit 2 is a document from Priority Energy, describing work performed on the Unit on March 23, 2022. Initial Buyers' Exhibit 3 is a document from Bright Painting, containing an itemized list of the work it performed in the Unit, with indications of painting performed on the walls and ceilings in the living room, dining room, kitchen, office, hallway, bathroom, master bedroom, and staircase. The document also references repairs "of all the holes in the different areas of the house" and of "the window frames." The total listed charge is $6400.

¶ 25    Following argument, the circuit court denied KPLN's 2-1401 petition, stating that while it found both Kaplun and Eason had testified credibly, it accepted Eason's testimony as to the "facts and circumstances and to the work performed prior to the completion of the disclosure report." The court concluded, "I believe that there has been no new evidence which would permit the Court to set aside its prior judgment." This appeal followed.

¶ 26                                    JURISDICTION

¶ 27    The circuit court denied the 2-1401 petition on March 27, 2023, and KPLN filed their notice of appeal on April 10, 2023, giving this court jurisdiction pursuant to Illinois Supreme Court Rule 303 (eff. July 1, 2017).

¶ 28                                    ANALYSIS

¶ 29    KPLN's lone cognizable claim on appeal is the circuit court erred by denying the 2-1401 petition. Within that claim, KPLN also raises issues regarding the evidentiary and credibility determinations the court made during the hearing. Before we begin, though, we note that KPLN raises multiple other claims in their brief regarding issues from the underlying trial. These claims

are not before this court, and will not be considered. See *In re Marriage of Arjmand*, 2024 IL 129155, ¶ 29 (A notice of appeal confers jurisdiction only regarding the portions of judgments identified in the notice of appeal). Appellees ask us to strike the portions of KPLN's brief that raise the improper claims, but this is unnecessary, as their inclusion does not impact our ability to analyze the properly raised claim. See *Centro Medico Panamericano, Ltd vs. Benefits Management Group, Inc.*, 2016 IL App (1st) 151081, ¶ 21.

¶ 30    A 2-1401 petition is a mechanism through which a party can seek to reverse a judgment entered more than 30 days previously through establishing the discovery of new evidence which, if known at the time, would have caused the court not to enter the order. *Warren County Soil and Water Conservation District v. Walters*, 2015 IL 117783, ¶ 31. It is "an independent and separate action from the original action and must be supported by affidavit or other appropriate showing for matters not in the record." *Nunez v. C&C Investments of Chicago, LLC*, 2022 IL App (1st) 211423, ¶ 15. To establish a right to relief via a 2-1401 petition, the proponent must demonstrate (1) a meritorious claim exists based on new evidence, (2) due diligence in discovering that evidence, and (3) due diligence in bringing the petition. *Warren County*, 2015 IL 117783, ¶ 51. A circuit court may hold an evidentiary hearing if the 2-1401 petition involves factual issues. *People v. Vincent*, 226 Ill. 2d 1, 9 (2007). The burden of proof is on the proponent by a preponderance of the evidence. *Id.* at 7-8.

¶ 31    Our standard of review depends on the nature of the claim. If a 2-1401 petition presents a purely legal issue, our review is *de novo*. See *Warren County*, 2015 IL 117783, ¶¶ 46-49. Otherwise, any factual findings of the circuit court, including credibility determinations, are reviewed under the manifest weight of the evidence standard, while the court's ultimate decision whether to grant or deny the 2-1401 petition is reviewed for abuse of discretion. See *Nunez*, 2022

IL App (1st) 211423, ¶¶ 16-17; see also *In re Marriage of Plancon*, 2023 IL App (1st) 220510-U, ¶ 44 (discussing *In re Marriage of Labuz*, 2016 IL App (3d) 140990, ¶ 36).[1]

¶ 32    A 2-1401 petition can seek relief based on newly discovered evidence demonstrating that a party used perjurious testimony to secure the challenged underlying order. See *People v. Burrows*, 172 Ill. 2d 169, 179-80 (1996). Although typically raised in criminal cases, Illinois courts have considered this argument in civil contexts. See *Highview Group, Ltd. v. William Ryan Homes, Inc.*, 2023 IL App (2d) 220019, ¶ 52; *Cartwright v. Goodyear Tire & Rubber Co.*, 279 Ill. App. 3d 874, 885 (1996). "Where a section 2–1401 petition seeks relief based upon alleged perjured testimony, it must be shown by clear, convincing, and satisfactory evidence that the testimony was not only false, but that it was willfully and purposely falsely given." *Johnson v. Steiner*, 179 Ill. App. 3d 556, 561-62 (1988).

¶ 33    Before turning to the substance of the circuit court's decision at the evidentiary hearing, we must consider the threshold issue KPLN raises regarding whether the court admitted improper evidence at the 2-1401 hearing. A court's decision to admit evidence is soundly within its discretion, and will not be reversed absent a showing that it abused that discretion. *People v. Heineman*, 2023 IL 127854, ¶ 59.

¶ 34    KPLN claims the circuit court's admission of the checks written to Priority and Bright violated Rule 901 regarding authentication and the best evidence rule (see Ill. R. Evid. 1002 (eff. Jan. 1, 2011)). Both arguments fail.[2]

---

[1] Cited for persuasive purposes per Illinois Supreme Court Rule 23(e)(1) (eff. Feb. 1, 2023).

[2] KPLN summarily argues in the reply brief that exhibits related to Priority should not have been admitted at the evidentiary hearing. This argument fails because KPLN waived it by not including it in the opening brief, and because they provide no authority in support. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020); *Toushin v. Ruggiero*, 2021 IL App (1st) 192171, ¶ 73.

¶ 35    First, regarding authentication, Rule 901 states evidence can be authenticated based on the testimony a witness with firsthand knowledge. Ill. R. Evid. 901(b)(1) (eff. Sept. 17, 2019). That is just what happened here—McClure testified that he wrote the checks that the circuit court then admitted. This testimony was sufficient authentication, which obviates the arguments KPLN raises regarding Eason' ability, through testimony or affidavit, to authenticate the checks. See *Cook v. Village of Oak Park*, 2019 IL App (1st) 190010, ¶ 17.

¶ 36    Next, regarding the best evidence rule, a party seeking to admit a check into evidence need not reproduce the original, so long as testimony establishes the version of the check introduced at trial is an accurate duplicate—again, exactly what happened here. See *People v. Bowman*, 95 Ill. App. 3d 1137, 1142-43 (1981). KPLN's lone argument is a general objection that the checks were admitted with redactions, but the decision to redact evidence is within a court's discretion, and KPLN provides no argument or support for the contention that the admission of the checks with redactions constituted an abuse of discretion. See *People v. Csaszar*, 375 Ill. App. 3d 929, 940-41 (2007) (decision of whether to permit review of unredacted documents is within court's discretion). Accordingly, the circuit court's admission of the checks also complied with Rule 1002's requirements.

¶ 37    Having found that the circuit court did not improperly admit evidence at the evidentiary hearing, we must next consider KPLN's argument that the court erred by finding Eason's testimony credible, as whether Eason testified credibly at the 2-1401 hearing bears directly on the analysis of whether her trial testimony was perjurious. A circuit court's credibility determinations at an evidentiary hearing are accorded great deference, and a reviewing court will not substitute its judgment for that of the circuit court on this issue. See *People v. Ross*, 191 Ill. App. 3d 1046,

1054 (1989). Accordingly, credibility determinations will not be reversed unless they are against the manifest weight of the evidence. *Id.*

¶ 38   Based on the record, we find the circuit court reasonably concluded that Eason testified credibly at the 2-1401 hearing, and thus we cannot set aside the court's finding as against the manifest weight of the evidence. *Nunez*, 2022 IL App (1st) 211423, ¶ 17. Here, the record can be reasonably interpreted to support the court's conclusion, and that ends our role on review. See *Best v. Best*, 223 Ill. 2d 342, 350 (2006) (for reversal under the manifest weight of the evidence standard of review, a factual finding must be "unreasonable, arbitrary, or not based on the evidence presented," or the opposite conclusion must be "clearly evident" from the record). Eason's testimony was that, in relevant part, the defects testified to at the underlying trial existed, but were addressed in the time between the trial and the resale such that their Disclosure form to the subsequent buyers accurately reflected the Unit's condition. The support for this account in the record is substantial:

> (1) Eason testified that the only known remaining defect was disclosed in full, and indeed the Disclosure form contains this admission;
>
> (2) Eason testified that she and McClure performed work themselves on the Unit, and the record contains receipts for materials necessary for such work;
>
> (3) Eason testified that Bright and Priority performed work to address the defects referenced at the underlying trial, and the record contains checks made out to those entities, along with documents from those entities indicating they worked on the Unit in a manner consistent with Eason's testimony at the evidentiary hearing; and
>
> (4) The record contains communications between the initial buyers' attorneys and the subsequent buyers' attorneys disclosing the underlying litigation and explaining the

issues the litigation centered on, further indicating the initial buyers were not attempting to hide anything such that their credibility could be called into question. On this record, a reasonable factfinder could conclude that Eason's testimony was credible.

¶ 39    KPLN argues that its evidence, including the testimony and affidavit of Kaplun, raised doubts about the veracity of Eason's testimony, and that other aspects of the record allowed for negative inferences regarding her credibility. Specifically, KPLN notes the lack of evidence regarding (1) significant payments to the contractors or personal expenditures for repair materials, and (2) whether Bright actually remediated any mold issues. This argument fails because even if we accept KPLN's contention that a reasonable factfinder could infer from the record that Eason's testimony was untrustworthy, that is not the only reasonable interpretation of the record (as explained above). When the record allows for conflicting reasonable inferences, it is not this court's role to substitute its judgment for that of the lower court on how it resolved that conflict. See *Ross*, 191 Ill. App. 3d at 1054. The court here resolved the conflict in Eason's favor, and reversal of that finding is inappropriate given the circumstances.

¶ 40    KPLN also argues that the initial buyers' truthfulness at the underlying trial is countered by the fact that they never reported the alleged post-verdict work to the HOA. Even accepting that this argument could lead to an inference that the work was not done, however, this argument does not make reversal appropriate considering the significant evidence in the record that some work was in fact performed, along with Eason's testimony that she did not believe the Bylaws required disclosure to the HOA, testimony which, again, we must accept as credible. See *Best*, 223 Ill. 2d at 350.

¶ 41    Turning to the ultimate issue, with the evidentiary record and credibility determination issues resolved, we find that the circuit court did not abuse its discretion in concluding that the

Disclosure form did not so contradict the initial buyers' trial testimony such that KPLN could establish perjury. First, having accepted that Eason testified credibly at 2-1401, there is no basis to infer from the Disclosure form that the defects testified to at trial never existed. Eason presented a viable basis for the court to accept that both her trial testimony and the Disclosure form were accurate, and Kaplun's affidavit and testimony were not so conclusive that the court could not find both his and the initial buyers' accounts credible.

¶ 42 Second, and perhaps most crucially, the circuit court's finding was not an abuse of discretion because KPLN's evidence, even if accepted, would not have entitled it to reversal of the underlying order, and KPLN's theory of the case is based on a fallacy. It rests on the proposition that, presuming no repairs actually occurred following the underlying trial, the initial buyers must not have listed certain defects on the Disclosure form because those defects never existed, making their underlying trial testimony false. But a different and equally plausible conclusion can be drawn from the Disclosure form's lack of listed defects, again presuming no repairs occurred: the defects the initial buyers testified to at trial did in fact exist, but they then failed to disclose the unrepaired defects to the subsequent buyers. Thus, even if KPLN had successfully convinced the court at the evidentiary hearing that the initial buyers never performed any repairs on the Unit (the only proposition its evidence purported to do), such a conclusion would not have constituted the clear and convincing evidence of perjury at the underlying trial required for KPLN's 2-1401 petition to succeed. *Johnson*, 179 Ill. App. 3d at 561-62.

¶ 43                                     CONCLUSION

¶ 44 KPLN's newly discovered evidence did not establish the initial buyers committed perjury at the underlying trial, and therefore we affirm the circuit court's denial of KPLN's 2-1401 petition.

¶ 45 Affirmed.