(No. 77950.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. JOSEPH BURROWS, Appellee.

*Opinion filed April 18, 1996.*

MILLER, J., joined by BILANDIC, C.J., specially concurring.

James E. Ryan, Attorney General, of Springfield (Norbert J. Goetten and Charles F. Mansfield, of the Office of the State's Attorneys Appellate Prosecutor, of counsel), for the People.

Michael Hemstreet, of Kathleen T. Zellner & Associates, of Naperville, for appellee.

JUSTICE McMORROW delivered the opinion of the court:

Following a jury trial, defendant was convicted of murder and armed robbery and was sentenced to death. His convictions and sentence were affirmed on direct review (*People v. Burrows*, 148 Ill. 2d 196 (1992)) and the United States Supreme Court denied his petition for a

writ of *certiorari* (*Burrows v. Illinois*, 506 U.S. 1055, 122 L. Ed. 2d 137, 113 S. Ct. 984 (1993)). Defendant then sought post-conviction relief (725 ILCS 5/122—1 *et seq.* (West 1992)) and post-judgment relief (735 ILCS 5/2—1401 (West 1992)). After a hearing, the trial court granted the defendant's request for a new trial, and the State appeals. Upon review, we are asked to consider *inter alia* whether the defendant should be awarded a new trial, based on (1) evidence that two prime witnesses against the defendant (Gayle Potter and Ralph Frye) have admitted that their trial testimony was perjured, and one of those witnesses (Gayle Potter) has admitted that she alone killed the victim; and (2) evidence that a witness (Jana West), who allegedly could not be located for defendant's trial, would testify that Potter told her that Potter had shot and killed a man on the date that the victim was murdered.

## Background

Defendant was convicted for his participation in the armed robbery and murder of William Dulin that occurred at the victim's home in Sheldon, Illinois, in early November 1988.[1] Forensic evidence established that the victim, who was in his late eighties, had been shot in the head at close range and that money and clothing had been taken from his person. There were no signs of forced entry into the residence and no fingerprints to link defendant or any other individual to the crimes. Blood found at the scene was identified as that of Gayle Potter, who was indicted with the defendant for the crimes committed upon Dulin. Another individual, Ralph Frye, was also indicted for his involvement in the incident.

---

[1]Defendant's first trial resulted in a hung jury. He was retried, convicted, and sentenced in proceedings that have now culminated in the instant appeal.

Both Potter and Frye testified against defendant at his trial. Their testimony is set out in greater detail in the earlier appeal in which defendant's convictions and sentence were affirmed. *Burrows*, 148 Ill. 2d 196. Briefly restated, Potter testified that she was a drug dealer and that Steve Poll was her drug supplier. Potter stated that in November 1988 she learned that Poll believed that she owed him money from a cocaine deal. Potter went to see Poll at the gas station where he worked on November 8, 1988. Defendant, who was Poll's "enforcer" and would collect money for Poll, was also there. According to Potter, Poll suggested that she borrow the money from a "rich, old farmer," referring to Dulin. She testified that Poll told defendant to "persuade" her to obtain the money and that defendant hit her on the head. Potter agreed to meet defendant and Frye later that evening at a parking lot in Watseka. Potter knew Dulin because her mother had provided housekeeping services for Dulin, and Potter had been to the Dulin residence and borrowed money from Dulin in the past.

Potter further testified at defendant's trial that she drove the automobile of the father of a friend, Chuck Gullion, to meet the defendant and Frye. Once she had arrived at the parking lot, she found defendant and Frye, who were waiting in a truck. They followed her to Dulin's home. She stated that when she arrived at Dulin's house, she went to the front door and knocked; Dulin opened the door and let her in. Defendant and Frye also entered although they had not been invited in by Dulin. Once in the residence, Potter asked Dulin to loan her $3,000. When he refused, defendant brandished a gun and told Dulin to write a check. Dulin refused, the two men struggled, and defendant shot Dulin in the head. Potter testified that she became hysterical and that defendant hit her on the side of the head, causing her to bleed. She was forced outside and into the truck

with Frye while defendant returned to the residence to remove fingerprints. When defendant emerged, he was carrying papers, clothing, a gun, and a paper sack. Defendant and Frye then left in their truck, while Potter departed in the vehicle she had used to arrive there.

Potter stated that the following day, defendant and Poll came to her home, gave her a check signed by Dulin in the amount of $4,050 and told her to have the check cashed. She went with her friend, Gullion, a day later to a nearby bank in an effort to cash the check. When Gullion attempted to cash the check, the bank clerk refused to honor it. Gullion returned to the car and gave the check to Potter, who burned the check. Shortly thereafter, she and Gullion were arrested by police authorities.

Potter admitted that the murder weapon was hers. She explained that it had been stolen from her trailer shortly before the Dulin murder and that she believed the defendant had taken it from her. She stated that she did not realize until after the incident that the defendant had put the weapon back in the car she was driving, and that she later told her boyfriend, Rick Gillespie, to hide the gun in the woods. The weapon was recovered by authorities in a wooded area near Potter's trailer a few days after the murder.

Another of defendant's codefendants, Ralph Frye, also testified against defendant at trial. His testimony was substantially similar to that provided by Potter, in that he recounted Potter's encounter with defendant at the gas station where Poll worked; the trio's drive later that evening from a parking lot in Watseka to the home of Dulin in Sheldon; Potter's efforts to obtain $3,000 from Dulin; and defendant's shooting of the victim when the latter refused to give Potter the funds she desired. Frye also corroborated Potter's account that defendant hit her while in the Dulin residence when she became

hysterical over the shooting and that defendant removed money and articles of clothing from the Dulin home.

Both Frye and Potter acknowledged during their trial testimony that they had given prior, inconsistent statements to authorities and others regarding what had transpired during the incident. Potter admitted that she had initially lied and told police that she did not know anything about the Dulin murder. Later she changed certain portions of her story regarding how and when she had arrived at the Dulin residence.

Frye similarly admitted that his statements to authorities were not wholly consistent with his trial testimony. He also acknowledged that he had given a tape-recorded statement to defendant's attorneys in which Frye denied being present for the Dulin murder. He explained in the tape-recorded statement that he had lied to the police about his involvement in the incident because he was confused and the officers had threatened him. However, at defendant's trial, Frye recanted his exculpatory statements and gave testimony to the effect that he had been present when defendant shot Dulin. Both Potter and Frye acknowledged that they had adjacent cells while in prison and that they spoke to each other on a daily basis through a food slot.

Rick Troyer, Potter's step-cousin, also testified at defendant's trial. He stated that on the night of the incident, Potter came to his apartment in Watseka accompanied by Gillespie and Gullion. Gullion gave Potter some keys and she left the apartment, returning at approximately midnight. When Potter returned, she had blood in her hair. She was carrying a pair of pants, a shirt, and a coat. According to Troyer, Potter placed some money on a table and said that she "thought there would be more than two hundred fifty dollars there," explaining that she "had stripped the body to protect Shaun." Troyer recounted that Potter also said that she

had been "bushwhacked" during a drug deal, thus accounting for her head wound. Troyer testified that he heard Potter tell Gullion that there was a gun in the car and that Gullion left the apartment briefly and returned with several gunshot shells, some of which were spent, and some of which were not. Troyer stated that shortly thereafter, Potter left the apartment with Gillespie and Gullion.

Defendant presented the defense of alibi at his trial. Witnesses testified in his behalf in an effort to demonstrate that neither he nor Frye was at the Dulin residence on the night of the murder. The jury found the defendant guilty of Dulin's murder and armed robbery and he was sentenced to death.

Defendant's subsequent motions for post-judgment and post-conviction relief relied *inter alia* upon recantations provided by both Potter and Frye. In testimony given at the trial court's hearing with respect to defendant's post-judgment and post-conviction claims, Potter acknowledged that she had shot and killed Dulin on the night of the incident. She testified that she was alone at the time and that neither defendant nor Frye had accompanied her to Dulin's residence. Potter explained that she had gone to ask Dulin to loan her money and that he refused when she admitted that she needed the funds to repay a drug debt. Potter stated that Dulin started to push her toward the doorway and that she became afraid, removed her gun from her bag, and fired three shots into the ceiling. According to Potter, Dulin reached for a gun hanging on the wall that "looked like a German Lueger" and she became frightened. Dulin hit her in the head with the butt of the gun and she shot him once in the shoulder and then dropped her gun. Both she and Dulin reached down to retrieve the weapon, but she picked it up first. As she was raising the revolver, it discharged, hitting Dulin in the head

and killing him. Potter recounted that she went over to Dulin's desk and removed checks from the desk drawer. Potter testified that she did not remove any money or clothing from Dulin's person while she was at the residence. After retrieving the checks, she fled the home.

Potter reiterated that neither defendant nor Frye was ever with her, and that she alone had shot Dulin. She explained that everything she had previously told authorities, and all of her earlier in-court testimony at the trials of the defendant, Frye, and herself, were all fabrication. Potter explained that she was now telling the truth about the incident because it was part of her drug rehabilitation program to be accountable to those whom she had harmed from her conduct in the past. Potter stated that she did not want to see defendant, who was innocent, punished for crimes he did not commit.

Frye also testified at the trial court's evidentiary hearing with respect to defendant's post-judgment and post-conviction claims. He stated in relevant part that he had not accompanied defendant or Potter to the Dulin residence on the night of the murder and that he had no involvement in the incident. Frye explained that he had given the authorities inculpatory statements because he was sick, under medication, and frightened when he was questioned by police. He testified that his explanation of the incident derived from information that was given to him by the officers who interrogated him after he was arrested and that he had no actual knowledge of what had transpired when Dulin was shot and robbed. Frye further stated that his exculpatory statement to defendant's attorney had been truthful, but that he had withdrawn it under pressure from Potter and the prosecutor, who threatened that he would receive a greater criminal sanction if he did not cooperate and inculpate the defendant in the crimes.

To further support his claim for a new trial based on newly discovered evidence, defendant offered the testimony of Jana West. She testified that on Sunday, November 6, 1988, the date on which Dulin was killed, she went to visit her friend, Lynn Pine, in Potomac. She spent the day with Lynn at Lynn's home. Defendant came to the house at approximately 8:30 p.m. with a friend and watched television. He stayed until 12:30 a.m. and then left to go home, saying that his wife would be angry that he had been out so long. West testified that she knew defendant through Lynn Pine but that she did not consider defendant a friend. She stated that Pine did not like the defendant and had "slammed the door in his face when he got there." West also acknowledged, however, that Pine was living with defendant's brother, Dennis Burrows.

West stated that she stayed at Lynn Pine's home that night and that, the following day, she and Pine went to Gayle Potter's trailer in Urbana. She could not recall why they had gone there. Potter was in the trailer with another woman and Rick Gillespie, Potter's boyfriend. West had never previously met Potter and, when introduced to Potter, noticed that she had blood in her hair. West asked Potter what had happened, and Potter responded that she had been pistol-whipped, although she did not say who had assaulted her. Potter further stated to West that Potter had "killed a man the night before because he had pistol-whipped her and she shot him in the head, and that somebody from around Chicago or in Chicago was going to come down and clean up the mess." West testified that Potter showed her a revolver with a light-colored handle and said that "it had been used to kill somebody but it wasn't registered so it wouldn't go back to anybody." Potter offered to sell the weapon to West, but West refused.

West stated that she changed residences in 1988 and

1989 and that she moved from Illinois to Phoenix, Arizona, in October 1989, where she lived until July 1990. West testified that no one ever contacted her about testifying at defendant's trial. Defendant's trial counsel testified that he attempted to locate West because he had been informed that she could provide an alibi for the defendant, but that he was unable to locate her.

Considering the evidence presented by the defendant in support of his motions, the trial court concluded that the defendant should receive a new trial. The State appeals from that ruling.

## Analysis

Defendant's request for a new trial was based on matters he raised in a petition for post-conviction relief (725 ILCS 5/122—1 (West 1994)) and a petition for post-judgment relief (735 ILCS 5/2—1401 (West 1994)). Specifically, defendant's post-judgment petition alleged that his convictions were based on the perjured testimony of Potter and Frye. Defendant's petition for post-conviction relief alleged *inter alia* that Jana West's statements provided newly discovered evidence of actual innocence that also warranted a new trial.

The State does not raise the question of whether newly discovered evidence of actual innocence presents a constitutional question appropriate for post-conviction relief, an issue now resolved by this court in *People v. Washington*, 171 Ill. 2d 475 (1996). The State's failure to raise the question operates as a waiver of the issue for purpose of our review (*People v. Wiley*, 156 Ill. 2d 464, 468 (1993); *People v. Holveck*, 141 Ill. 2d 84, 98-99 (1990); *People v. O'Neal*, 104 Ill. 2d 399, 407-08 (1984)), and we therefore assume, for the sake of analysis in the present cause, that newly discovered evidence of innocence is a proper claim under the Post-Conviction Hearing Act. With respect to defendant's argument based on an allegation of perjured testimony, we notethat this court

has recently reaffirmed that perjured testimony may form the basis for a new trial if raised in a motion for post-judgment relief under section 2—1401 of the Code of Civil Procedure (*People v. Brown*, 169 Ill. 2d 94 (1995)), as did the defendant in the present case.

A request for a new trial based on newly discovered evidence must satisfy two criteria. It must present evidence which was not available at the defendant's trial and which the defendant could not have discovered sooner through the exercise of due diligence. In addition, the evidence offered by the defendant must be of such convincing character that it would likely change the outcome of the trial. *People v. Albanese*, 125 Ill. 2d 100, 111 (1988) (quoting *People v. Molstad*, 101 Ill. 2d 128, 134 (1984), and *People v. Baker*, 16 Ill. 2d 364, 374 (1959)). Similarly, in a post-judgment motion for a new trial based on alleged perjury, the defendant must show, by clear and convincing proof, the substance of his allegations. *People v. Sanchez*, 115 Ill. 2d 238, 286 (1986); *cf. People v. Brown*, 169 Ill. 2d 94 (1995). It is the province of the trial court to determine whether the evidence presented by the defendant warrants a new trial, and a reviewing court will disturb that determination only if it is against the manifest weight of the evidence. See, *e.g.*, *Klein v. La Salle National Bank*, 155 Ill. 2d 201, 206 (1993); *People v. Miller*, 79 Ill. 2d 454, 464-65 (1980), quoting *Baker*, 16 Ill. 2d at 373-74.

The trial judge in the instant cause presided over both of defendant's trials and was the finder of fact who sentenced the defendant to death. The judge also presided over the evidentiary hearing with respect to defendant's petitions for post-judgment and post-conviction relief. Based upon his assessment of the credibility of the witnesses who testified at that hearing, the trial judge awarded the defendant a new trial. To reach this conclusion, the trial court determined *inter alia*

that West's testimony was newly discovered evidence of actual innocence and that Potter's earlier trial testimony had been perjured and that she had admitted, in court and under oath, that she alone killed the victim.

Reviewing the testimony presented at the evidentiary hearing, and bearing in mind the evidence that was presented against the defendant at his trial, we cannot say that the trial court's conclusion was against the manifest weight of the evidence. Considered cumulatively, the testimonies of Jana West and Gayle Potter bring into serious doubt the soundness of the jury's determination that defendant was guilty of the crimes for which he was tried and charged. Because consideration of these matters is sufficient to sustain the trial court's ruling, we do not address the parties' arguments with regard to other allegations made in defendant's post-conviction or post-judgment petitions.

Defendant's convictions were founded most significantly upon the statements made by Potter and Frye. On direct review, this court determined that the State's evidence was sufficient to prove the defendant guilty beyond a reasonable doubt. *Burrows,* 148 Ill. 2d at 229. Nevertheless, it is noteworthy that no physical evidence was ever discovered to link defendant to the crimes. Defendant's fingerprints were not found at the scene. No piece of evidence that belonged to or was associated with the defendant was recovered at the scene. None of the victim's belongings was ever discovered on the defendant's person or in his possession.

Although Frye and Potter testified at defendant's trial that defendant shot Dulin on the night of the incident, Frye recanted that testimony during the period between defendant's first and second trials. Frye has again recanted this testimony and now states that neither he nor defendant was present at the shooting. This is similar to the recantation testimony which this

court discounted on direct review. See *Burrows*, 148 Ill. 2d at 228. Defendant's present argument with respect to Frye's recantation is therefore barred by *res judicata*, inasmuch as it was previously adjudicated by this court on direct appeal and there is no significant difference between the recantations that Frye has provided. See, *e.g.*, *People v. Berland*, 74 Ill. 2d 286 (1978).

The testimony given by Potter at the post-judgment hearing is more troubling, however. As explained more fully below, her testimony at the hearing is not barred by principles of *res judicata* or waiver. Potter has now admitted that she alone went to Dulin's residence and killed him during a struggle. There is considerable circumstantial and testimonial evidence to corroborate Potter's self-incriminating admissions. A newly discovered and unbiased witness, Jana West, has testified that Potter admitted she had killed a man on the date that Dulin was murdered. Forensic evidence lends credence to Potter's account that she fought with Dulin and then shot him in the head. The trial testimony of Rick Troyer confirms that on the night of the murder, Potter came into his apartment late at night carrying men's clothing and a substantial amount of cash. She remarked that she had been involved in a fight and that she "thought there would be more money." Potter told Gullion that there was a gun in the car and he left the apartment briefly, returning with spent gunshot shells. This court is charged with the singular duty to closely scrutinize and review the evidence in every case where the death penalty has been imposed. See, *e.g., People v. Sanchez*, 131 Ill. 2d 417, 427 (1989) (Ryan, J., dissenting). The testimony provided by Potter and West calls into serious question the defendant's guilt, and the trial court did not err in awarding him a new trial.

The arguments made by the State do not convince us that the trial court's decision was in manifest error.

With respect to the testimony of Jana West, the State contends that defendant did not exercise due diligence in his efforts to find this witness, and that defendant should have been able to locate her before he was tried and convicted. The State contends that friends of West, who also knew the defendant, must have known of West's whereabouts.

The trial court determined that defense counsel made reasonable efforts to locate West before defendant's first trial but was unable to find her. An investigator was dispatched to the last known location of her residence, but he was unable to find West. West testified that she moved from one state to another during the period that defendant was awaiting trial and while he was on trial. She stated that she did not come forward because she did not want to get involved and because she did not believe that defendant would be convicted. Lynn Pine, who was a friend of West, testified at defendant's first trial that West had moved and that Pine did not know where West could be located. On this record, we cannot find manifest error in the trial court's factual determination that the defendant made genuine, but unsuccessful, efforts to locate West before he was tried and convicted.

· The State further argues that West's testimony was not a sufficient ground to warrant a new trial because her testimony was cumulative to that given by other persons at defendant's first trial. The State also contends that West's testimony was not of such a conclusive character that it would change the outcome on retrial.

At defendant's first trial, Lynn Pine and Rick Burrows testified that on the night that Dulin was killed, which was a Sunday, the defendant spent the evening watching television with them from approximately 8:30 p.m. until midnight. They could not remember what was airing on the television and thought it was a

"cowboy" program. Pine and Burrows acknowledged under cross-examination that, when they had spoken previously to authorities, they said that they might have been watching "Gunsmoke." It was brought out on cross-examination that "Gunsmoke" aired only on weeknights, not on Sundays.

Lynn Pine further testified that the following day, she and West drove to Potter's trailer. When they arrived, Chuck and Lydia Gullion were there, as were Potter and Rick Gillespie. Pine testified that Potter said that the previous evening, she (Potter) had gone to Watseka to see Shaun, one of her drug dealers. Potter stated that when she walked in, she saw that Shaun was dead. Potter recounted that two men were there and that they pistol-whipped her and hit her on the head. Pine confirmed that Potter had blood in her hair. Potter then said that she shot both of the men. Potter also told Pine that Shaun's father was in the Mafia and that he would "take care of the bodies."

Pointing to the rule that evidence in support of a post-judgment motion for a new trial cannot be "merely cumulative" to the evidence produced at trial (*Miller*, 79 Ill. 2d at 464-65), the State claims that West's account is merely cumulative to the trial testimony given by Lynn Pine at defendant's first trial. The State notes that both West and Pine said that defendant was with them on the night that Dulin was killed, and that both women gave similar testimony with respect to Potter's admissions that she had been pistol-whipped the night before and that she had shot someone during the incident.

West's testimony was not cumulative to the alibi evidence offered at defendant's second trial, since Pine did not testify at the defendant's retrial. Moreover, West's account served to corroborate Pine's testimony. West had no association with the defendant or with someone

in defendant's family. Pine, in contrast, lived with and had a child by defendant's brother. West's testimony thus lent considerable credence to Pine's account that Potter had made incriminating statements to the effect that she had been assaulted and had shot someone the night that Dulin was murdered.

The State also contends that the alibi testimony provided by West, Pine and Burrow was highly implausible. The State notes that at defendant's first trial, Pine and Burrows stated that the group watched a "cowboy" program, perhaps "Gunsmoke," and that this testimony was discredited when the witnesses acknowledged that "Gunsmoke" aired only on weeknights and not on Sundays. West testified at the court's post-judgment hearing that she believed the group watched a "cowboy" movie, although she could not remember its name.

We find the State's argument unpersuasive. The type of television program that was being aired is wholly collateral to the witnesses' testimony to the effect that defendant was with Pine, Burrows, and West on the night that the victim was killed. On this central issue the witnesses' accounts are consistent. We do not believe that a discrepancy with respect to whether the group watched a cowboy program or a cowboy movie is sufficient to render West's account inherently unreliable.

The State also points to testimony given at defendant's first trial by Lydia Gullion. Lydia testified that she was at Potter's trailer on the day after the killing and that neither Lynn Pine nor Jana West came over to Potter's residence. The State contends that West's testimony of Potter's incriminating statements is therefore a fabrication. We disagree. The circumstance that another witness at defendant's trial did not give testimony consistent with West's account does not render her testimony implausible. As noted previously, West had no demonstrable reason for coming forward

after trial to give testimony that would inculpate Potter and exonerate the defendant.

The State complains that defense counsel knew the weakness of the alibi defense, as set out in the testimony of Burrows and Pine at defendant's first trial, because counsel did not call these witnesses to testify at defendant's second trial. Defendant's trial counsel explained that he did not recall these witnesses because onlookers advised him that their testimony was not credible and in fact weakened the defendant's case. From this premise, the State contends that West's alibi testimony would not likely affect the outcome if the defendant is retried. We disagree. If West had come forward and testified, her testimony would have corroborated the accounts given by Pine and Burrows and would have strengthened the alibi defense.

Defense counsel's decisions with respect to matters of trial strategy were necessarily limited to the evidence he could produce for trial. The trial court, in contrast, relied upon all of the evidence now brought to light. We find no manifest error in the trial court's determination that West was a newly discovered witness who could provide significant evidence that the defendant was actually innocent of the Dulin murder and armed robbery. At the evidentiary hearing, West testified that Potter admitted that she had "killed a man the night before because he had pistol-whipped her and she shot him in the head." Potter showed West a gun that "had been used to kill somebody" but represented that it "wasn't registered so it wouldn't go back to anybody." It is undisputed that Potter was referring to the weapon that was used to shoot the victim and which Potter admitted was her own. West had no association, contact, or relationship with Potter and had no motive to testify in a manner that would incriminate Potter and exonerate the defendant. West's account of Potter's admissions

to having killed a man with Potter's gun a day earlier provides important evidence supporting the trial court's ruling to set aside defendant's convictions and grant him a new trial.

The trial court's decision to award defendant a new trial is further supported by the self-incriminating account Potter gave at the court's evidentiary hearing. In that testimony, Potter admitted under oath that she alone committed the killing, that defendant was not present at the shooting, and that defendant did not accompany her to the Dulin residence. The State contends that Potter's incriminating testimony should be disregarded because it was barred by principles of *res judicata* or waiver. The State maintains that *res judicata* applies because the defendant raised the same claim in his direct appeal. Alternatively, the State contends that defendant's argument is waived because the defendant could have made it his direct appeal, but failed to do so.

The purpose of post-judgment review is not to relitigate matters that were or could have been raised on direct appeal, but rather to resolve arguments that new or additional matters, if they had been known at the time of trial, could have prevented a finding that the defendant was guilty of the crimes charged. *Berland*, 74 Ill. 2d at 314. Claims that were raised on direct appeal, or that could have been made on direct appeal, are barred under principles of *res judicata* and collateral estoppel. Post-judgment relief is limited to matters relating to evidence that did not appear in the record of the trial court's original proceedings and that was discovered after trial was completed. *Berland*, 74 Ill. 2d at 314-15.

The evidence that Gayle Potter had committed perjury at defendant's trial and that she alone had committed the murders was not evidence of record at the

defendant's trial. In the direct appeal, defendant had no specific admission by Potter upon which defendant could base an argument that Potter's trial testimony was a fabrication. See *Burrows*, 148 Ill. 2d at 225-28. Upon post-judgment review, defendant produced Potter's in-court testimony that she lied and that she committed the crimes. This new evidence was not presented at defendant's trial and could not have been produced by him at that proceeding. As a result, principles of *res judicata* and waiver do not bar the court's consideration of the new evidence now raised by the defendant. The cases cited by the State are distinguishable and inapposite, since none of them involved a witness who admitted, after trial, that he gave perjured testimony at the defendant's trial. See *People v. Collins*, 153 Ill. 2d 130 (1992); *People v. Del Vecchio*, 129 Ill. 2d 265 (1989); *People v. Orndoff*, 39 Ill. 2d 96 (1968); *People v. Garner*, 146 Ill. App. 3d 743 (1986).

The State contends that Potter's recantation testimony does not sustain the trial court's determination to award the defendant the post-judgment remedy of a new trial. It is true, as a general rule, that recantations are often deemed highly unreliable. *People v. Steidl*, 142 Ill. 2d 204, 254 (1991). However, Potter did not merely recant her trial testimony. Potter made wholly self-incriminating admissions, under oath, that placed blame for the killing on Potter herself and also exonerated the defendant of any involvement in the murder.

The State maintains that Potter's testimony was not clear and convincing. See *People v. Bracey*, 51 Ill. 2d 514 (1972) (evidence of perjury must be clear and convincing). For example, the State points out that her statements were not made to close acquaintances shortly after the victim was killed. This circumstance is not fatal to the defendant's claim, however. It is noteworthy that Potter admitted to West, a day after the killing, that

Potter had "killed a man the night before because he had pistol-whipped her and she shot him in the head ***."

Evidence discovered at the scene corroborated Potter's in-court admissions. Potter testified that the victim struck her with a gun that he had taken from the wall. Dulin's relatives testified that Dulin had a gun that he hung on the wall and that it was no longer there when his body was discovered. Potter's blood was found at the scene, on the desk from which she admitted she took the victim's checks. Potter stated that she and the victim struggled. Forensic evidence indicated that the victim had sustained defense wounds consistent with a struggle. Potter said that she fired three shots into the ceiling and then shot Dulin twice, in the shoulder and then in the head. Evidence from the scene confirmed that there were three shots fired into the ceiling. Forensic evidence substantiated that the victim had been shot twice, once in the shoulder and once in the head.

The trial testimony of Potter's step-cousin, Rick Troyer, also corroborated Potter's self-incriminating admissions. Troyer stated that Potter left Gullion and Gillespie at his apartment and departed by herself. When she returned a few hours later, she had a head wound and explained that she had been "bushwhacked." She placed a large amount of money on the table and said that she "thought there would be more money there." She was also carrying men's clothing, including a pair of pants. She told Gullion that there was a gun in the car; he left the apartment and returned shortly with spent gunshot shells. Troyer's account confirms Potter's admission that she was alone when he went to Dulin's residence, became involved in a physical struggle with him during which he hit her on the head, and that she shot him and took items from his home.

Potter's testimony was further substantiated by

other evidence presented at defendant's trial. For example, Potter admitted that the weapon used to shoot the victim was her own gun and that she carried it with her to and from the crime scene. This testimony stands in sharp contrast to Potter's testimony at defendant's trial, when Potter stated that the weapon had been stolen from her trailer shortly before the incident; she believed the defendant was the person who broke into her trailer and stole the gun; the defendant brought the gun with him to the Dulin residence on the night of the shooting; the defendant placed the gun in a paper sack in Potter's vehicle after the shooting; and that Potter did not realize until much later that the murder weapon was in her possession.

The State contends that Potter's admission should not be given credence because she had already lied on several prior occasions and because she has never given a wholly consistent account of what happened the night that the victim was killed. The State's position does not explain why Potter would inculpate herself and exonerate the defendant with respect to the victim's murder. The inconsistencies in Potter's earlier accounts may well be attributable to her futile efforts to shift blame for the incident to the defendant, and do not destroy the ultimate trustworthiness of her admission that she alone killed the victim.

The State further claims that Potter's testimony should be rejected because she had nothing to lose by claiming that she was alone when she killed the victim. We disagree. It is highly significant that Potter made wholly self-incriminating statements and represented that she alone killed the victim. The circumstance that Potter incriminated herself lends credence to the veracity of her statements. According to the State, Potter cannot be prosecuted for having murdered the victim because she has already been tried and convicted for

her participation in the crimes. The State contends that prosecution of Potter for having killed the victim would violate principles of double jeopardy. We do not address this double jeopardy argument on its merits. Potter's admissions of having killed the victim would certainly have collateral consequences, affecting the possibility of parole from her present convictions. Moreover, if Potter is tried and convicted for other criminal activity, her present admissions in the Dulin case will impact the sentence she would receive. For these same reasons, whether Potter may be tried and convicted for perjury is an issue which we need not address in the present appeal. By admitting that she alone killed Dulin, Potter placed herself at risk for substantial criminal consequences.

Based upon our review of the record, we find no manifest error in the trial court's judgment. Accordingly, the trial court's judgment is affirmed and the cause is remanded to the circuit court for a new trial.

*Judgment affirmed;*
*cause remanded.*

JUSTICE MILLER, specially concurring:

I agree with the majority that the court below properly awarded the defendant a new trial, relief the defendant sought in a petition under section 2—1401 of the Code of Civil Procedure (735 ILCS 5/2—1401 (West 1992)). At the hearing on the petition, prosecution witness Gayle Potter recanted her trial testimony, which implicated the defendant in the murder involved here, and testified that she alone committed the offense. A remedy under section 2—1401 is available in these circumstances. As this court explained in *People v. Brown*, 169 Ill. 2d 94, 107-08 (1995), unlike the Post-Conviction Hearing Act (725 ILCS 5/122—1 through 122—8 (West 1992)), section 2—1401 does not require a constitutional violation as a predicate for relief, and therefore a defen-

dant may prevail on a section 2—1401 petition even when the prosecution was not aware of the witness' perjury.

The defendant's post-conviction petition raises different questions, however, and the majority's discussion does not clearly distinguish between the two proceedings. As *Brown* noted, the Post-Conviction Hearing Act and section 2—1401 of the Code of Civil Procedure impose distinct prerequisites for relief; nowhere does the majority explain how its treatment of the defendant's post-conviction petition, and its allegations of newly discovered evidence, can be reconciled with our decision in *Brown*, which denied post-conviction relief to a defendant alleging perjury at his trial. For the reasons set forth in my dissent in *People v. Washington*, 171 Ill. 2d 475 (1996), I do not believe that a free-standing claim of newly discovered evidence of innocence presents a constitutional claim that may form the basis for post-conviction relief in a noncapital case.

In any event, having determined that the defendant is entitled to a new trial on the strength of the evidence presented at the hearing on his section 2—1401 petition, we have no cause here to address the separate question whether relief may also be obtained in this capital case under the Post-Conviction Hearing Act. I do not join that portion of the majority opinion.

CHIEF JUSTICE BILANDIC joins in this special concurrence.