NOTICE
Decision filed 01/26/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 230061-U

NO. 5-23-0061

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Macon County. |
| | ) | |
| v. | ) | No. 14-CF-302 |
| | ) | |
| RAJIV D. RICE, | ) | Honorable |
| | ) | Jeffrey S. Geisler, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BARBERIS delivered the judgment of the court.
Justices McHaney and Sholar concurred in the judgment.

**ORDER**

¶ 1     *Held*: We affirm the third stage dismissal of defendant's third amended successive postconviction petition for failure to show, by a preponderance of the evidence, a substantial violation of a constitutional right.

¶ 2     A jury found defendant, Rajiv D. Rice, guilty of attempted first degree murder (720 ILCS 5/9-1(a)(1) (West 2012)) on the theory of accountability, and the trial court sentenced him to 40 years in prison. After the Fourth District affirmed his conviction on direct appeal (*People v. Rice*, 2017 IL App (4th) 141081-U), defendant filed a postconviction petition. The trial court dismissed defendant's postconviction petition at the first stage and the Fourth District subsequently affirmed the dismissal. *People v. Rice*, 2021 IL App (4th) 190131-U. Defendant was granted leave to file a successive postconviction petition. Defendant appeals the trial court's dismissal of his third amended successive postconviction petition at the third stage of postconviction proceedings.

1

Because defendant failed to establish a claim of actual innocence based on the theory of self-defense, we affirm.

¶ 3                                   I. BACKGROUND

¶ 4     A complete recitation of the facts of the case are contained in defendant's direct appeal. See *Rice*, 2017 IL App (4th) 141081-U. As such, we limit our recitation to those facts relevant to our disposition of this appeal and include additional facts in the analysis section as needed to address defendant's specific arguments.

¶ 5     On March 19, 2014, the State charged defendant with attempted first degree murder (720 ILCS 5/9-1(a)(1) (West 2012)), a Class X felony, alleging defendant shot Katari Smith with the intent to kill him. The evidence presented at defendant's August 19, 2014, jury trial showed that defendant's co-defendant, Rafael Kennedy, drove a gray, four-door vehicle with tinted windows to the Moundford Terrace Apartment complex in Decatur, Illinois, on March 16, 2014, with defendant riding in the passenger seat. Smith, who was at the apartment of his girlfriend, Kearstyn Collins, testified that he heard his car window break around 2:00 p.m. Smith subsequently looked out of a window and saw a man in a "hoodie" standing by his car. The gray, four-door vehicle was parked nearby, with the passenger door open, and defendant sitting in the passenger seat. Smith ran downstairs towards his car, at which time, he saw his car on fire before he was shot in the upper left knee. According to Smith, he did not see who shot him. Smith subsequently crawled back into the apartment building.

¶ 6     As police responded to a call for a shooting involving a gray, four-door vehicle, police observed a car matching the description driving at a high rate of speed. As police pursued the gray vehicle and activated emergency lights, Kennedy failed to stop. During the pursuit, police saw shattered glass held together by window tinting fall from the passenger-side window. Kennedy

2

eventually pulled over. Police recovered two spent .45-caliber shell casings in Kennedy's car—one located on the rear passenger-side floorboard, and one located on the rear driver's-side floorboard. Police also discovered the fragments of a car window near two semiautomatic handguns (a .40-caliber Ruger and a .45-caliber Remington) that defendant threw on the roadway from the gray vehicle. Chelsea Grider, the owner of the gray vehicle, testified that she loaned Kennedy her vehicle but denied that any shell casings were in her car when Kennedy took possession.

¶ 7 At the Moundford Terrace Apartments, police discovered four spent .45-caliber shell casings on the roadway where the gray vehicle was parked, as well as 12 spent .380-caliber shell casings and two projectiles on the sidewalk inside the fenced-in area near Collins's apartment building. Police also found an empty box of .380-caliber ammunition inside Collins's apartment and two .380-caliber handguns in the attic of Collins's apartment. Evidence revealed that the four .45-caliber shell casings were fired from the .45-caliber handgun that defendant threw from the gray vehicle. Moreover, the evidence demonstrated that the .380-caliber shell casings found in the yard were fired from two .380-caliber handguns found inside Collins's apartment. In addition, the evidence indicated that visible bullet holes perforated the fence behind the apartment building demonstrated that two groups of people fired at each other.

¶ 8 Moreover, testimony revealed that Tyheim Johnson, Kennedy's cousin, was shot earlier in the day on March 16, 2014, before the shooting in the instant case. Although Smith denied knowledge of Johnson's shooting and that gang disputes existed in Decatur, as well as the placement of .380-caliber pistols in Collins's apartment attic and .380-caliber shell casings in the yard, the evidence revealed that shell casings in the street near Johnson's body were fired from one of the .380-caliber guns found in Collins's apartment. Moreover, testimony revealed that

3

defendant had a picture of an individual holding a handgun on his cell phone. Although police could not identify the individual holding the handgun, testimony revealed that the serial number was visible in the picture and matched the serial number of the .40-caliber Ruger pistol defendant threw from the gray vehicle during the police pursuit. Furthermore, the trial court denied defendant's motion *in limine* to bar the State's introduction of defendant's gang affiliation. The State argued, and testimonial evidence revealed, that defendant and Kennedy were members of the West Side Gang in Decatur, while Smith was a member of the rival gang on Decatur's east side. The State argued, and the trial court agreed at sentencing, that the incident at the Moundford Terrace Apartments demonstrated retaliation between two rival gangs for the shooting of Johnson earlier in the morning on that same day.

¶ 9       On August 22, 2014, a jury found defendant guilty of attempted first degree murder, and the trial court imposed an aggregate prison sentence of 40 years, which included 25 years for the attempted first degree murder conviction, plus a 15-year firearm enhancement for defendant being armed with a firearm during the commission of the offense. Defendant filed a direct appeal, and the Fourth District Appellate Court affirmed defendant's convictions. *Rice*, 2017 IL App (4th) 141081-U.

¶ 10       On January 24, 2019, defendant filed a *pro se* postconviction petition, alleging, *inter alia*, ineffective assistance of trial and posttrial counsels; the trial court erred by denying defendant's motion to dismiss on speedy trial grounds; the trial court lacked authority to alter his sentence more than 30 days after imposition of his sentence; his sentence was disproportionate compared to his co-defendant, Kennedy, who received 27 years in prison; and that the cumulative effect of trial counsel's and the trial court's errors violated his due process rights. The trial court summarily dismissed defendant's *pro se* postconviction petition at the first stage of proceedings. Defendant

appealed, and the Fourth District Appellate Court affirmed the trial court's dismissal of defendant's postconviction petition. *Rice*, 2021 IL App (4th) 190131-U.

¶ 11　　On March 16, 2020, defendant filed a *pro se* motion for leave to file a successive postconviction petition. Defendant included his successive petition for postconviction relief, alleging that he had newly discovered evidence to support his claim of actual innocence. The trial court subsequently granted defendant's motion, appointed counsel, and advanced defendant's successive postconviction petition to second stage proceedings, although several motions to continue took place.

¶ 12　　On January 6, 2021, defendant, represented by postconviction counsel, filed an amended petition for postconviction relief, asserting that Smith signed an affidavit that stated "he was promised leniency in a current case he had pending if he would leave out facts that would have supported a claim of self-defense" by defendant. Defendant attached Smith's signed affidavit, dated October 12, 2019, to his amended petition for postconviction relief.

¶ 13　　In Smith's affidavit, Smith claimed that a man named "LaRon" and two unidentified individuals asked to "lay lo" at Collins's apartment because LaRon recently shot someone. While at Collins's apartment, LaRon and the two unidentified individuals concocted a plan to rob "a guy" by pretending they had inexpensive marijuana for sale. After a man agreed to buy the marijuana from LaRon, a gray car pulled up outside. A man exited the vehicle but stood close to the car, while LaRon attempted to convince him to come inside the apartment to finalize the drug transaction. Shortly after the men noticed that "the man" was not alone, LaRon started shooting. Smith stated that "[i]t was all happ[en]ing so fast because next thing I know I was shot in the leg." Smith stated that he "want[ed] it to be known that if Rafael Kennedy or [defendant] was shooting in are [*sic*] direction[,] it was in self-defense." Smith claimed police instructed him that he would

5

"get a good deal on [his] pending case" if he "ke[pt] it simple and don't [*sic*] say anything about the setup" at defendant's trial. Smith complied.

¶ 14    On February 25, 2022, postconviction counsel filed a second amended successive petition for postconviction relief, attaching the affidavits of Smith and Kronterial Bond. Postconviction counsel asserted that, although Smith had passed away by the time defendant filed his second amended successive petition for postconviction relief, his death should not foreclose defendant's postconviction claims, given Bond's availability to corroborate Smith's affidavit. Alternatively, postconviction counsel argued trial counsel was ineffective for failing to interview Smith and to raise and preserve defendant's self-defense claim.

¶ 15    In Bond's affidavit, dated August 12, 2021, Bond stated that Smith asked him to come to Collins's apartment. After Bond arrived, three of Smith's friends arrived. Bond heard "Lil Ron" say out loud that he had "a[n] easy robbery" after he told a man on the phone that he had "cheap price[d]" weed. Thirty minutes later, Bond and others went to Smith's car to smoke weed. At that time, Lil Ron talked to the man on the phone. As Bond saw a gray car pull up, Bond and Smith decided to walk back inside Collins's apartment, stating that they "wasn't finna [*sic*] be part of th[e]" robbery. While Lil Ron tried to convince the man to buy the marijuana inside the apartment, defendant rolled down his window to spit. According to Bond, defendant was on the phone, and Lil Ron and "Black" started to shoot "in the direction of the person outside the car" and "at the car where [defendant] was sitting." Bond later found out Kennedy was the man Lil Ron was setting up to rob.

¶ 16    Bond further attested that Black shot Smith as Smith ran back into the apartment building. Bond attested that the shooting happened "so fast [and] [he] never seen [*sic*] [defendant] with a gun nor shoot a gun. And even if [defendant] did [shoot a gun], [h]e wasn't the person who shot

6

[Smith] and \*\*\* [defendant] did not initiate no [*sic*] gun fire. It was Lil Ron and Black." As Lil Ron helped injured Smith back into the apartment building, Lil Ron stated that "his true intentions was [*sic*] to kill [Kennedy] because he was having sex with his girlfriend so he was trying to trick him over to where he was so he could kill him." According to Bond, Smith "was mad Lil Ron kept saying 'His fault' because he shot him on a[n] accident." Bond referred to defendant and Kennedy as "victims." Bond stated that he called defendant's attorney but "none of [his] calls was [*sic*] returned."

¶ 17    On July 8, 2022, defendant, represented by postconviction counsel, filed a third amended successive postconviction petition, raising a "freestanding claim of actual innocence" based on newly discovered evidence, including several claims: (1) a witness affidavit of Smith clarifying his trial testimony, and "for the first time," stating defendant acted in self-defense after another individual shot at defendant and that Smith felt coerced into testifying against defendant; (2) a witness affidavit of Kronterial Bond clarifying that he was present during the shooting and he did not observe defendant in possession of a firearm, defendant was on his phone when shots were fired, and Bond observed another individual fire shots at Smith; and (3) a witness affidavit of Jakaelin Gregory stated that he was present during the shooting when he saw Kennedy and defendant while walking to a gas station, defendant was on his phone when shots were fired, and Gregory observed an unknown individual shooting at defendant and Kennedy, causing Gregory, defendant, and Kennedy to run and take cover from the gunfire.

¶ 18    Defendant argued that all three affidavits supported his claim of self-defense, demonstrating that he was not the aggressor but that he was in danger of imminent harm that "objectively and subjectively required the return of gunfire as an equal use of force." Defendant asserted that these statements were new, material, and non-cumulative, and of such a conclusive

7

nature that they would probably change the result on retrial, as well as evidence that could not have been discovered prior to trial with the exercise of due diligence.

¶ 19    Alternatively, defendant argued that trial counsel rendered ineffective assistance by failing to interview Smith or issue him a subpoena during defendant's initial trial proceedings. In addition, defendant argued ineffective assistance of trial counsel by failing to raise a self-defense claim based on the affidavits of Smith, Bond, and Gregory. Moreover, defendant claimed the evidence failed to demonstrate that he was armed with a firearm, and thus, innocent of the charged offense. Defendant attached the affidavits of Smith and Bond, as provided above, as well as the affidavit of Gregory.

¶ 20    In Gregory's affidavit, dated June 23, 2022, Gregory attested that he saw Kennedy and defendant pull up to the apartment building while walking to a gas station. Gregory stated that he spoke to Kennedy and saw defendant—a local, famous rapper—on his phone. Soon after, Kennedy received a call, prompting Gregory to continue walking to the gas station. Gregory then heard Kennedy state, "That's what ya'll on," and saw Kennedy run. Gregory subsequently saw "a dude in a black hoody start shooting" at Kennedy. Gregory ran and took cover on the side of the apartment building. While hiding, Gregory saw "another black male" shoot at Kennedy and defendant from behind the apartment building through the fence. Gregory stated that he ran back to a friend's apartment and called a ride to leave the area because he was on probation and "didn't want to get in anyone's beef."

¶ 21    On January 4, 2023, the State filed a motion to dismiss defendant's third amended successive postconviction petition. The next day, on January 5, 2023, the circuit court held a hearing, where the court denied the State's motion to dismiss and advanced defendant's third

8

amended successive postconviction petition to the third stage of postconviction petition proceedings.

¶ 22    On January 26, 2023, the trial court held defendant's third stage evidentiary hearing. The following evidence was adduced.

¶ 23    Defendant testified first on his own behalf. Defendant testified that he never saw a car fire or Smith on March 16, 2014. While on his phone, defendant, who was sitting in the passenger seat of the gray car, heard gunshots and saw the passenger-side window shatter. As Kennedy ran back to the vehicle, defendant "got low" in the vehicle before Kennedy and defendant drove away. Defendant claimed that he believed he and Kennedy were being ambushed.

¶ 24    On cross-examination, defendant testified that he did not know why Kennedy drove to the Moundford Terrace Apartments. Defendant admitted that he threw two guns—his gun and a gun he found in the cupholder—out the car window during the police pursuit. Defendant testified that Bond was currently incarcerated in the Illinois Department of Corrections (IDOC) with defendant, and Gregory had been incarcerated in IDOC with defendant at some point. Defendant testified that he told trial counsel that he and Kennedy were "fired upon first." On redirect examination, defendant denied that he coerced or forced Bond or Gregory to write any statements on his behalf. Defendant testified that he "most definitely told [Attorney Bob Wrigley] that we were fired upon first."

¶ 25    Next, Bond testified to the following. While incarcerated, Bond wrote an affidavit on defendant's behalf. Bond admitted that he did not initially come forward before or during defendant's trial because he "was in and out of jail." Bond then testified to the contents of his affidavit, stating that he and Smith were "somewhat" friends at the time of the shooting. A man named "Lil Ron," who was with Smith and Bond, wanted to rob Kennedy with another man named

9

"Black" under the guise of "buy[ing] some weed" from Kennedy. Several individuals went to Smith's car to smoke weed when Kennedy's car pulled up. Bond saw defendant in the passenger seat on his phone. Defendant then rolled down his window and spit, at which time, Lil Ron initiated gunfire. According to Bond, he never saw defendant with a gun, and he claimed that Black set Smith's car on fire to "make it look like it was an accident *** to cover up whatever was going on in the car." According to Bond, defendant and Kennedy "was [*sic*] long gone" when Black set Smith's car on fire. Bond testified that he attempted to contact defendant's trial counsel, but he did not return his calls.

¶ 26    On cross-examination, Bond denied that he spoke with defendant while incarcerated prior to writing his affidavit on defendant's behalf. Instead, Bond testified that he never spoke to, or crossed paths with, defendant prior to writing his affidavit. Bond testified that he felt compelled to write the affidavit several months after Smith died. Bond also testified that Black used lighter fluid and a lighter to set Smith's car on fire after the shooting. Bond clarified that he could not remember whether he called defendant's trial counsel before or after defendant's trial but confirmed that he called several years before he wrote his affidavit on defendant's behalf.

¶ 27    Next, Gregory testified to the following. While incarcerated, Gregory wrote an affidavit on defendant's behalf. Gregory then testified to the contents of his affidavit. On March 16, 2014, Gregory saw Kennedy and defendant parked at the Moundford Terrace Apartments while walking to a gas station. When Gregory heard gunshots, he took cover. While running, he testified that "[f]or a split second, [he] looked, and [he] saw a guy in a black hoodie shooting" at the car Kennedy drove. He confirmed the shooter was not Kennedy or defendant. Gregory denied defendant coerced or forced him to write any statements on defendant's behalf. Gregory testified that he did not come forward earlier because he was on probation, but "after sitting down and thinking about it," he

10

realized that defendant should not "be doing time for a crime [he] didn't commit." Gregory testified that he never saw a car fire before or after the shooting. Following Gregory's testimony, the trial court took judicial notice of "a list of impeachable" previous convictions in Macon County for defendant (two convictions), Bond (five convictions), and Gregory (four convictions).

¶ 28 Next, the State called Attorney Bob Wrigley, defendant's trial counsel, who testified to the following. Attorney Wrigley, a 50-year attorney at the time of his testimony, testified that he did not speak to Smith in anticipation of defendant's trial. In his experience, victims "normally do[ ] n[o]t talk to defense attorneys." Attorney Wrigley testified that his trial strategy for defendant's case was that "[defendant] was not involved in committing the offense." In explaining that he did not consider raising self-defense at defendant's trial, Attorney Wrigley testified to the following:

> "The offense took place at the home, I thought, of Katari Smith or he was there alone. [Defendant] and the co-defendant went to that place, and that's where the altercation took place and the gunshots took place. I didn't feel like the testimony of self-defense was something that the jury would buy. I thought that would probably do damage to any other testimony which the defendants had, if they wished to testify, as they were, according to the evidence, the people that went to where the victim was, and that they fired the first shots."

Attorney Wrigley did not recall defendant mentioning that "he never fired any shots or that he was fired upon first." Attorney Wrigley seemed confused that defendant engaged in a taped interview with police following the shooting before stating that he knew defendant made statements to police that were admitted at defendant's trial.

¶ 29 Attorney Wrigley also testified that he informed defendant that he had concerns about defendant testifying, given defendant had prior convictions which made him susceptible to impeachment. Attorney Wrigley denied that Bond or Gregory attempted to contact him or his office prior to trial, or that he was aware Bond or Gregory were potential defense witnesses. On cross-examination, Attorney Wrigley testified that he did not check his notes or defendant's file

11

prior to his testimony, but that he could "positively" say that he did not tell defendant not to testify. He, again, testified that "defendant never did indicate to me that they were fired upon first."

¶ 30    Next, defense counsel called defendant as a rebuttal witness. Defendant testified that Attorney Wrigley lied when defendant testified that he never said he was shot upon first on March 16, 2014. He testified that he told the officers and Attorney Wrigley the same thing. Defendant also testified that he told Attorney Wrigley that he wanted to assert the defense of self-defense. Defendant also testified that Attorney Wrigley did not give him the choice of whether or not to testify.

¶ 31    Following testimony, postconviction counsel discussed Smith's affidavit, which "recant[ed] his trial testimony." Postconviction counsel highlighted that, although Smith was deceased, his statement, which was made against his own interest, should be admitted on retrial. Counsel asserted that Bond and Gregory were eyewitnesses and present at the shooting. Although neither of them "really ma[d]e themselves very known prior to the trial," they were both present and stated that "Lil Ron [wa]s the person who initiated any gunfire," which supported defendant's self-defense claim. Counsel highlighted that Smith and defendant were in rival gangs, and Bond was friends with Smith, which supported defendant's actual innocence claim. Moreover, defense counsel highlighted that Gregory did not see a car fire, which supported defendant's claim that he was not involved in setting Smith's car on fire. Counsel also highlighted that Attorney Wrigley failed to consult his file or notes before testifying, although he represented defendant several years before. Counsel highlighted that defendant was "adamant" that he talked to Attorney Wrigley about his self-defense claim, but Attorney Wrigley never pursued it. Instead, Attorney Wrigley ran on the assumption that Smith, the victim, would not talk to defendant's attorney. As such, counsel argued that the evidence demonstrated defendant received ineffective assistance of counsel.

12

Defense counsel then clarified that the "self-defense claim comes in" because defendant mentioned "touching a firearm" if individuals said defendant fired a gun.

¶ 32    In response, the State argued that Smith's "new statement is bunk." The State offered another explanation why Smith would recant and support defendant, stating: "There's another possibility here, and it's that if everybody is in a gang, if they all agree that nobody talks to the police, maybe nothing happens to them in terms of prosecution." The State then noted that the affidavits of Smith and Bond did not mention the car fire. Pointing to the trial testimony of Jennifer Morris, a neighbor at the Moundford Terrace Apartments, who heard gunshots, opened her front door, and saw a "grayish-silver car *** driving away, and there's a car on fire," which the State argued supported Smith's initial timeline that he heard a loud sound outside and saw someone had broken his car window, prompting him to run downstairs and see his car on fire. The State argued that "this isn't Hollywood[,] [t]he car isn't going to immediately catch like that. Normally, that's obvious to a neighbor."

¶ 33    Instead, the State argued that Smith's initial timeline supported the State's theory of the case that Kennedy and defendant used the car fire to draw everyone out of the apartment following Johnson's shooting. The State clarified that the chemical analysis from trial showed Smith's car was set on fire with gasoline, not lighter fluid, as Bond had testified. The State also highlighted that Bond's affidavit stated that Lil Ron was going to rob Kennedy; however, a robbery never actually happened because "shots are immediately fired rather than any attempt to get the weed or the money" from Kennedy. The State also highlighted that Bond's testimony contradicted his affidavit, where he testified that Lil Ron was the buyer, not the seller, of marijuana. The State also asserted that both Bond and Gregory only came forward after they were incarcerated in the same

13

IDOC facility as defendant, which, according to the State, called into question the veracity of the statements.

¶ 34    With respect to defendant's claim of ineffective assistance of counsel, the State highlighted that the trial court admonished defendant on the record that Attorney Wrigley could only give "his best advice as to whether he thinks you should testify or not. It's up to you ultimately. Are you telling me it's your decision not to testify? To which defendant replies, yes, sir." The State argued that Attorney Wrigley had "a very good command of exactly what this case had to do with, even several years later." The State argued that Attorney Wrigley was more credible than defendant, who lied to police during the initial interview when he stated that the "window [of Kennedy's car] just fell out," whereas he testified at the hearing that the window broke when he threw his gun out of the window.

¶ 35    With respect to defendant's self-defense claim, the State highlighted that the evidence demonstrated that "two sides exchang[ed] shots based on the casings that we have here." The State asserted that "[s]ome of the casings were matched up to the guns that were tossed from [Kennedy's] vehicle *** [a]nd, of course, we've got the gunshot residue," which demonstrated "exchanged fire." Based on the facts that demonstrated Kennedy and defendant went to Collins's apartment armed and set fire to Smith's car to draw him out of his apartment, the State argued it was trial strategy, not ineffective assistance, on Attorney Wrigley's part not to assert self-defense, especially where defendant maintained he did not fire a gun during the shooting. As such, the State argued that defendant failed to meet his burden of showing, by a preponderance of the evidence, a substantial violation of a constitutional right as to his claims of actual innocence and ineffective assistance of counsel.

14

¶ 36 Following argument, the trial court first determined that credible testimony did not exist that would be of such conclusive character that it would change or probably change the results on retrial concerning defendant's claim of actual innocence. For support, the court reasoned that the testimonies of Bond and Gregory were incredible, especially given both individuals came forward after defendant's trial while they were incarcerated in IDOC with defendant. In addition, the court noted that the contradictory testimonies of Attorney Wrigley and defendant did not contain credible testimony that would change the result on retrial. The court also determined that, based on the evidence, self-defense would not have been an effective defense. For support, the court pointed to the testimonies of Bond and defendant who stated that defendant never shot a gun, and Gregory's testimony that he did not know who shot first. Based on the foregoing, the court denied defendant's third amended successive postconviction petition. Defendant filed a timely notice of appeal.

¶ 37                                      II. ANALYSIS

¶ 38 On appeal, defendant argues that the trial court erred by denying his third amended successive postconviction petition following a third stage evidentiary hearing. Defendant contends that newly discovered evidence, including affidavits from Smith, Bond, and Gregory, demonstrated defendant's actual innocence based on the theory of self-defense. In response, the State argues that defendant failed to establish actual innocence, thus, the court properly denied defendant's petition. We agree with the State.

¶ 39 The Post-Conviction Hearing Act provides a means by which a defendant may challenge his conviction or sentence for violations of federal or state constitutional rights. *People v. Pendleton*, 223 Ill. 2d 458, 471 (2006). A postconviction proceeding "offers a mechanism for a criminal defendant to assert a collateral attack on a final judgment." *People v. Robinson*, 2020 IL

15

123849, ¶ 42. At the third stage, unlike the first and second stages, the allegations are not taken as true; instead, "the trial court acts as a factfinder, making credibility determinations and weighing the evidence." *People v. Reed*, 2020 IL 124940, ¶ 51. The third stage is the same for both initial and successive petitions. *People v. Smith*, 2014 IL 115946, ¶ 34. At the third stage, the trial court may receive "affidavits, depositions, testimony, or other evidence, and may order the [defendant] brought before the courts." *People v. Gerow*, 338 Ill. App. 3d 524, 527 (2009). The defendant must show, by a preponderance of the evidence, "a substantial showing of a constitutional violation." *Pendleton*, 223 Ill. 2d at 473.

¶ 40    When a petition advances to the third stage evidentiary hearing, we will not reverse a trial court's decision of fact finding or credibility determinations unless "manifestly erroneous." *Id.* "Manifest error is clearly evident, plain, and indisputable." (Internal quotation marks omitted.) *People v. Coleman*, 2013 IL 113307, ¶ 98. "[A] decision is manifestly erroneous when the opposite conclusion is clearly evident." *Id.* This deferential standard of review reflects the understanding that the trial court is in the best position to observe and weigh the credibility of witnesses. *People v. Coleman*, 183 Ill. 2d 366, 384-85 (1998).

¶ 41    In order to succeed on a claim of actual innocence, a defendant must present new, material, noncumulative evidence that is so conclusive it would probably change the result on retrial. *People v. Edwards*, 2012 IL 111711, ¶ 32. "New means the evidence was discovered after trial and could not have been discovered earlier through the exercise of due diligence." *Coleman*, 2013 IL 113307, ¶ 96 (citing *People v. Burrows*, 172 Ill. 2d 169, 180 (1996)). Material means the evidence is relevant and probative of the defendant's innocence. *Id.* Evidence is noncumulative if it would add to information heard by the jury at trial. *Id.* Whether the evidence is conclusive refers to whether the new evidence, considered with trial evidence, would probably cause a different result than

16

occurred at the trial. *Id.* With a claim of actual innocence, the defendant "must raise the probability that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Edwards*, 2012 IL 111711, ¶ 33. Whether the evidence is of such a conclusive nature that it would probably change the result on retrial, is the most important piece of analysis. *People v. Sanders*, 2016 IL 118123, ¶ 47 (citing *People v. Washington*, 171 Ill. 2d 475, 489 (1996)).

¶ 42    Upon review, we cannot conclude that the trial court's dismissal of defendant's third amended successive postconviction petition following a third stage evidentiary hearing was manifestly erroneous. The primary purpose of the third stage hearing is to test the reliability, credibility, or veracity of the new evidence and determine whether the new evidence is compelling enough to place the trial evidence in a new light and undermine the confidence in the finding of guilt. See *Coleman*, 2013 IL 113307, ¶ 114. In this case, the trial court, after observing the witnesses testifying at the third stage hearing and reading Smith's affidavit, concluded that the testimony and affidavits filed on defendant's behalf were not likely to change the result on retrial. We cannot disagree. Importantly, because defendant bears the burden of presenting evidence that is (1) new, (2) material, (3) noncumulative, and (4) conclusive (*Coleman*, 2013 IL 113307, ¶ 96), we affirm the trial court's judgment that the evidence was not conclusive.

¶ 43    The trial court, comparing the evidence presented at the third stage evidentiary hearing with the evidence presented at defendant's trial, determined that a different result on retrial would not occur. First, the court determined that the testimonies and affidavits of Bond and Gregory were incredible. For support, the court highlighted that Bond and Gregory, who claimed they were eyewitnesses to the shooting, came forward to write affidavits on defendant's behalf seven (Bond, August 2021) and almost eight (Gregory, June 2022) years after defendant's August 2014 trial. In

17

reasoning that their affidavits lacked credibility, the court found it important that Bond and Gregory wrote their affidavits while incarcerated in IDOC with defendant. Moreover, the court found it important that Bond and Gregory had significant criminal records in Macon County, which raised credibility issues for the court. Next, the trial court determined that Smith's affidavit lacked reliability, where Smith recanted his trial testimony over five years after defendant's trial, noting that "recantation testimony is regarded as unreliable in this situation."

¶ 44    While Smith's affidavit and the testimonies and affidavits of Bond and Gregory challenged defendant's role in the shooting, the trial court could not conclude that defendant raised the probability that it was more likely than not that no reasonable juror would have convicted him in light of the new evidence. The evidence at trial indicated that Morris, a neighbor at the Moundford Terrace Apartments, heard gunshots, opened her front door, and saw a "grayish-silver car *** driving away, and there's a car on fire." As such, this evidence demonstrated that Smith's car was on fire *as* Kennedy and defendant drove away, and not set on fire by Black after defendant and Kennedy left the apartment complex. However, as the State points out, Bond's testimony and affidavit offered no logical explanation why Black destroyed Smith's car after a group of men smoked weed in it, and the chemical analysis showed Smith's car was lit on fire with gasoline. Moreover, to discredit the new affidavits that all failed to mention the car fire and defendant's testimony that he did not see a car fire, the State argued at the third stage evidentiary hearing that the trial evidence, including Morris's testimony, fit with Smith's initial timeline that Smith heard a loud sound outside, saw his car window broken, ran downstairs, and saw his car on fire.

¶ 45    The trial evidence is important because the State argued at defendant's trial that gang membership, specifically that Kennedy and defendant—both members of the West Side Gang— went to the Moundford Terrace Apartments to avenge the same-day shooting of Johnson,

18

Kennedy's cousin, by Smith, a member of the East Side Gang. Importantly, the State asserted that Kennedy lit Smith's car on fire to lure Smith outside to shoot him. Further supporting the State's theory was that the evidence at trial demonstrated that the shooting of Johnson was forensically linked to Collin's apartment, where police discovered in the attic of Collins's apartment a .380-caliber pistol that matched the shell casings found at the scene where Johnson had been shot. In addition, defendant's DNA was on the grip of the .45-caliber Remington pistol—the pistol with which Smith was shot—and two spent .45-caliber shell casings were on the back floorboard of Kennedy's vehicle, where defendant was sitting in the passenger seat at the time of the shooting with the passenger door open, according to Smith's testimony. Moreover, as the Fourth District pointed out, defendant's conduct in the immediate aftermath of the shooting tended to increase the likelihood that he was the shooter, given he attempted to conceal evidence, including the .45-caliber pistol bearing his DNA. See *Rice*, 2017 IL App (4th) 141081-U, ¶ 111. As such, we cannot conclude that the court's determination was manifestly erroneous where it stated that no credible testimony at the third stage hearing existed that would be of such conclusive character that it would change or probably change the result on retrial.

¶ 46    Accordingly, this court cannot conclude that the trial court's credibility and factual determinations are manifestly erroneous, where the court dismissed defendant's claim of actual innocence based on the theory of self-defense, concluding that the evidence presented at the evidentiary hearing was not so conclusive that it would probably change the result on retrial, especially where the Fourth District observed in defendant's direct appeal that the evidence tended to show that defendant fired several shots at Smith and that one of those shots hit Smith in the knee. *Id.* ¶ 110.

19

¶ 47                    III. CONCLUSION

¶ 48    For the foregoing reasons, we hereby affirm the trial court's third stage dismissal of defendant's third amended successive postconviction petition.

¶ 49    Affirmed.